LIBERTY MUTUAL INSURANCE CO.,
Plaintiff, Appellant,

v.

CONTINENTAL CASUALTY CO.,
Defendant, Appellee.

LIBERTY MUTUAL INSURANCE CO.,
Plaintiff, Appellee,

v.

CONTINENTAL CASUALTY CO.,
Defendant, Appellant.

Nos. 84–1877, 84–1878.

United States Court of Appeals,
First Circuit.

Argued May 8, 1985.

Decided Aug. 23, 1985.

James D. Casey, Boston, Mass., with whom Law Offices of James D. Casey and Steven A. Rusconi, Boston, Mass., were on brief for Liberty Mut. Ins. Co.

Thomas D. Burns, Boston, Mass., with whom Charles Mark Furcolo, Alan K. Posner, Steven H. Goldberg and Burns & Levinson, Boston, Mass., were on brief for Continental Cas. Co.

Before CAMPBELL, Chief Judge, COFFIN and TORRUELLA, Circuit Judges.

COFFIN, Circuit Judge.

The issues in these cross-appeals center upon the costs incurred by H.H. Robertson Co. (Robertson) and its assignee, plaintiff Liberty Mutual Insurance Co. (Liberty), in defending Robertson in three state court suits arising out of the failure of glass panels which Robertson had installed in the Hancock Tower in Boston, Massachusetts. In one of these suits, a declaratory judgment action brought by defendant Continental Casualty Company (Continental), it was held that Continental was obligated, pursuant to a comprehensive liability insurance policy, to defend Robertson in the other two suits, both of which were ultimately settled. Thereafter, Liberty filed this federal action in an attempt to recover from Continental the $1.75 million that Liberty had spent in defending Robertson. Trial on the question of what part of these fees[1] were reasonable resulted in a jury verdict of $1.29 million for Liberty. The district court entered judgment for that amount plus $610,000 in interest. Both parties appeal with respect to several of the district court's rulings. For reasons detailed below, we affirm the district court in all respects but one.

## BACKGROUND

A number of parties were involved in the construction of the Hancock Tower, which was commenced in 1969. Four of the parties, including Robertson, the installer of the glass panels constituting the "curtain wall" that formed the outside of the building,[2] were insured by two policies underwritten by defendant Continental and purchased by the owner of the building, the John Hancock Mutual Life Insurance Company (John Hancock). The primary policy, the only one that is of concern here, stated that Continental had "the right and duty to defend any suit against [Robertson] seeking damages on account of bodily injury or property damage...."

By the spring of 1973, it was clear that the curtain wall was seriously defective, as numerous glass panels were being blown from the building and onto the streets below. On June 1, 1973, Robertson notified Continental's agent by letter that John Hancock considered Robertson to be in breach of its contract to install suitable and safe glass panels. Robertson added that it would present to Continental any claims that might be filed for personal injury or property damage arising out of the failure of the glass panels. On June 8, 1973, Continental's agent responded in a letter, noting that no claims for personal injury or property damage had yet been filed, suggesting that its policy might not cover a contract claim by John Hancock (ostensibly because John Hancock was a co-insured under the policy and not a "third-party"), and promising that Continental would live up to the obligations of its policy if and when a third-party claim for injuries and property damage were presented. Interpreting this response as a firm statement that Continental would not defend Robertson against any breach of contract action subsequently filed by John Hancock, Rob-

---

1. Throughout this opinion we shall use the term "fees" to refer both to fees charged for work performed by attorneys and to legal expenses incurred for such items as travel, experts, and depositions.

2. A "curtain wall" is an exterior wall attached to the superstructure of a building in such a way that it encloses the interior space but provides no support for the building.

ertson retained the legal services of Goodwin, Procter & Hoar on June 20, 1973.

For a number of reasons, including the fact that John Hancock, Robertson, and others involved in the design and construction of the building agreed to try to solve the problem of the defective panels before filing any suits, it was not until more than two years later, on September 15, 1975, that John Hancock filed suit in state court against Robertson and several others.[3] Continental's formal refusal to defend Robertson in that action was indicated in a letter dated October 10, 1975. Approximately one month later, a second state action was filed, this one by Mama Leone's, a local restaurant whose business was adversely affected by the falling glass. On January 26, 1976, Continental sent a letter refusing to defend Robertson in this second liability suit. In both cases, Continental's contention was that certain provisions in the policy excluded coverage of the type of claims brought by John Hancock and Mama Leone. To fully set forth its view of its obligations under the policy and to obtain a judicial determination thereof, Continental filed a third state action, one for declaratory judgment, on April 20, 1976.

The two liability suits were eventually settled by all parties, with Robertson agreeing in December of 1982 to pay approximately $2.6 million in damages. During the years of litigation, Liberty and its counsel, the law firm of Goodwin, Procter & Hoar, asked Continental on a number of occasions whether it wanted to change its position and take over Robertson's defense of the two liability suits. Each time Continental declined to assist. Not until June of 1981, when litigation of the declaratory judgment action resulted in an initial determination that Continental's policies did obligate it to defend Robertson, did Continental's stance begin to soften. Thereafter, while appealing the declaratory judgment ruling to the Massachusetts Supreme Judicial Court, Continental made serious ef-

forts to settle the two liability claims. Settlement was achieved about 18 months later, and two years after that Massachusetts's highest court affirmed the lower court's decision in the declaratory judgment action, establishing once and for all Continental's duty to defend. *Continental Casualty Co. v. Gilbane Building Co.*, 391 Mass. 143, 156, 461 N.E.2d 209, 217 (1984).

On April 20, 1983, Liberty, which in 1977 had assumed the cost of defending Robertson in all three of the state actions, commenced this suit against Continental. In its complaint, Liberty sought the $1.75 million in fees it had incurred plus interest measured from the various dates on which it had made fees payments to Goodwin, Procter & Hoar. Trial was held to determine whether all or part of that amount was reasonably incurred. As we noted at the outset, the jury found that only $1.29 million was reasonable and thereafter the court determined that under Massachusetts' interest provision for contract actions, Mass.Gen.Laws ch. 231, § 6C, $610,000 in interest should be awarded. On appeal Liberty claims that rather than trying the question of the reasonableness of the fees, the district court should have simply awarded the full amount of fees incurred, and that significantly greater interest should have been awarded. Continental cross-appeals, claiming that a new trial should be granted because the district court incorrectly allowed Liberty to recover, first, fees incurred before the John Hancock suit was filed in 1975 and, second, fees incurred in the defense of the declaratory judgment action. Continental also claims that various remarks by the trial court in the presence of the jury seriously prejudiced Continental's case.

DISCUSSION

A. *Burden of Proving Reasonableness of Incurred Fees and Expenses*

■ Liberty contends that, as a matter of law, it should have recovered the attorney's fees actually incurred and that it

---

3. Among the other named defendants were the architect, I.M. Pei & Partners, and the general contractor, the Gilbane Building Company.

should not have been required to establish the reasonableness of those fees. We are not persuaded by any of the grounds that Liberty advances to support this claim.

In the first place, Liberty suggests that Massachusetts law calls for the recovery of incurred fees, rather than reasonable fees. There is no support for this in Massachusetts case law, *see Magoun v. Liberty Mutual Insurance Co.*, 346 Mass. 677, 684, 195 N.E.2d 514, 519 (1964) (insurer required to pay the "reasonable charges" of counsel hired by insured); *Mandell v. Fidelity & Casualty Co.*, 170 Mass. 173, 178, 49 N.E. 110 (1898) (insured's duty is "to take all reasonable means to reduce" the amount of its liability in defending against a claim that the insurer refuses to defend). Furthermore, the standard treatises on the law of insurance establish clearly that only reasonable fees may be recovered. 7C J. Appleman, Insurance Law and Practice § 4691, at 261 (1979) ("[A]ttorneys' fees incurred by the insured in the defense of an action must be shown to be reasonable to allow a recovery thereof from the insurer."); 14 G. Couch, Cyclopedia on Insurance 2d (Rev. ed.) § 51:61, at 539 (1982); 1 R. Long, The Law of Liability Insurance § 5.15, at 5–97 (1985). To apply a lesser standard would be to invite excessive, duplicative, or outrageous charges—charges which were not originally contemplated by the parties to the policy and which, if allowed, might ultimately lead to increased premiums for many purchasers of insurance. We conclude therefore that the district court was correct in putting to the jury the question of whether all or part of the fees and expenses incurred by Robertson and Liberty were reasonable.

■ Secondly, Liberty contends that it should have been Continental's burden to prove the unreasonableness, not Liberty's to prove the reasonableness, of the fees and expenses actually charged by Goodwin, Procter & Hoar. This stands the law on its head. As we have just established, Liberty's claim was, by law, for the "reasonable" fees that it incurred. It is obvious that the party claiming such expenditures has the burden of proving them, including the burden of proving whether the fees were in fact reasonable. *See Snow v. Mikenas*, 373 Mass. 809, 812, 370 N.E.2d 1001, 1003 (1977); *First National Bank of Boston v. Brink*, 372 Mass. 257, 264, 361 N.E.2d 406, 410–11 (1977); *Lujan v. Gonzales*, 84 N.M. 229, 239, 501 P.2d 673, 683 (1972) (as an element of damages caused by breach of duty to defend, reasonable attorney's fees are to be proven by claimant); 7C J. Appleman, Insurance Law and Practice § 4691, at 261–62 (1979). Here, Liberty introduced into evidence the fees actually charged and the parties thereafter disputed the reasonableness, or unreasonableness, of various aspects of those fees. The burden of production certainly shifted during the examination of witnesses that followed, but the burden of persuasion properly remained with Liberty.

■ Finally, Liberty argues that since Continental breached its agreement to defend, it was equitably estopped from contesting the reasonableness of the fees. While there might have been merit to this claim if Continental had acted in bad faith or had attempted to mislead Liberty, such was not the case here. Liberty has conceded that Continental did not act in bad faith. Continental formally articulated its refusal to defend Robertson soon after each of the two liability suits was filed, commenced its declaratory judgment action to determine the parties' rights and obligations under the policies, and was, at least in ways that need not be explained here, partially successful in that action. To bar Continental from challenging the reasonableness of the fees incurred by Robertson and Liberty in conducting Robertson's defense would be to penalize Continental for having used legitimate means to determine the limits of its obligations. Equity does not call for such a harsh result. "Since policyholders in general have an interest, along with insurers, in defeating claims that are without merit, it seems unwise to ... [penalize] the useful activity of insurers in contesting claims that they reasonably conclude they should contest." R.

Keeton, Basic Text on Insurance Law § 7.4(b), at 458 (1971). Accordingly, we have been shown no basis in equity for barring Continental from challenging the reasonableness of the fees incurred by Robertson and Liberty.[4]

## B. *Calculation of Interest*

Under Massachusetts law, interest to be added to a judgment rendered in a contract action is governed by Mass.Gen.Laws ch. 231, § 6C, which provides:

"In all actions based on contractual obligations, upon a verdict, finding or order for judgment for pecuniary damages, interest shall be added by the clerk of the court to the amount of damages, at the contract rate, if established, or at the rate of twelve per cent per annum *from the date of the breach or demand.* If the date of the breach or demand is not established, interest shall be added by the clerk of the court, at such contractual rate, or at the rate of twelve per cent per annum from the date of the commencement of the action." (Emphasis added.)

In this case, the district court, 592 F.Supp. 659, assessed interest not "from the date of breach", as Liberty claims should have been done, but rather "from the various dates on which Liberty spent its money in making payments to" Goodwin, Procter & Hoar. The court explained that "despite the literal wording" of section 6C, to assess interest from the date of breach (which the court vaguely defined as the day when Continental "announced that it would not defend Robertson") would defeat the statutory purpose of making "Liberty whole for the [loss of the] use of its own funds" because Liberty had not actually incurred any legal expenses until the beginning of 1978, years after the initial breach occurred. In other words, the district court assessed interest from the dates of Liberty's payments for Robertson's legal services in order to keep Liberty from obtaining a tremendous windfall under what the court believed to be a too literal application of section 6C. We review the district court's determinations both for any clearly erroneous findings of fact and for any errors of law.

Initially, we note that the date of breach has not been clearly established. The state declaratory judgment proceedings established only that there was a breach of the duty to defend, *Continental Casualty Co. v. Gilbane Building Co.,* 391 Mass. at 156, 461 N.E.2d at 217, not *when* that breach occurred. Similarly, neither the court nor the jury in this proceeding made a formal finding as to the date of breach. Liberty's choice of June 8, 1973—when Continental's agent first responded that it did not appear that a contract action by John Hancock would fall within the policies' coverage—may be a plausible choice, but it is by no means the only one. A good argument can be made, for example, that there could have been no breach of the duty to defend a suit until a suit was actually filed and Continental formally refused to defend Robertson, i.e., on October 10, 1975, in the John Hancock case and on January 26, 1976, in the Mama Leone case. *See, e.g.,* 14 G. Couch, Cyclopedia on Insurance § 51:43, at 457 ("The mere fact a claim has been asserted against the insured does not impose any duty of 'defense' upon the insurer, since until an action has been brought against the insured there is by definition no claim against which the insurer is required to defend.") Without a formal finding as to a precise date of breach,[5]

---

4. The primary case relied on by Liberty, *S.J. Groves & Sons, Co. v. Warner Co.,* 576 F.2d 524, 530 (3d Cir.1978), is distinguishable in that the defendant there was found to have acted in bad faith.

5. The jury did not consider the question of when the breach occurred, and the district court referred to no date of breach in its memorandum decision of September 18, 1984. Although the court did state at sidebar late in the trial that the breach occurred when Continental denied coverage and Liberty commented at the time that coverage was denied on June 8, 1973, the court did not go so far as to agree with that date. Moreover, at an earlier point in the trial, the court agreed with Continental that its duty under the policy was to defend against a suit, which suggests that there could have been no

Liberty's claim for interest from June 8, 1973, is seriously, if not completely, undermined.

In addition, it is worth noting that the absence of a finding as to the date of breach is in significant part attributable to Liberty's presentation of its case. Throughout most of the proceedings below Liberty was seeking, in the words of its original complaint, "interest calculated from the dates of payment by Liberty of Robertson's defense costs and legal fees...." Indeed, it was not until a few days before trial, when Liberty filed its requests to charge, that it gave any indication that it might seek interest from "the date of breach".[6] Moreover, Liberty did not move to amend the prayer for relief in its complaint to reflect its request for additional interest until more than three weeks after trial. Although the motion was granted, we note that what Liberty clearly established at trial was not the date of breach but rather the various dates of payment of fees to Goodwin, Procter & Hoar.

This prompts us to look to the dates of payment to determine whether, as Continental contends, they can be considered dates "of demand" within the meaning of section 6C.[7] In *Sargeant v. Commissioner of Public Welfare*, 383 Mass. 808, 822, 423 N.E.2d 755, 764 (1981), the Massachusetts Supreme Judicial Court held that the date of demand for payment was a suitable starting point for the accrual of interest. Although the situation in this case differs from that found in *Sargeant*, similar considerations apply. The duty to defend can and, in this case, did extend over a long period of time. As the testimony of both one attorney from Goodwin, Procter & Hoar and one representative of Liberty reveals, the firm and Liberty repeatedly told Continental over the years that it could fulfill its obligations by agreeing to defend Robertson for the remainder of the proceedings and reimbursing Robertson and Liberty for the fees already incurred. Thus, what we find in this case is a series of demands, and refusals, made over the lifetime of the two liability suits.

Viewed in this light, measuring interest from the several dates upon which Liberty paid fees for services that Continental was refusing to provide makes sense both in terms of the language of section 6C and in terms of the type of contract that is involved here. In terms of section 6C, these dates are in effect dates of demand for services or, perhaps more precisely, for payment for such services. As such, we conclude that it is permissible to view them as dates "of demand" within the meaning of section 6C. In terms of general insurance law, it is these dates that mark the beginning of the insured's loss of the use of its own funds. As one treatise on insurance law puts the matter, "[w]here interest is added to the amounts recovered it is calculated only from the time expenditures were actually made." 7C J. Appleman, Insurance Law and Practice § 4691, at 252 (1979).

We find no conflict, therefore, between the dictates of section 6C and the general rule of awarding interest for the insured's loss of the use of its funds. The Massachusetts Supreme Judicial Court has ruled that section 6C "is designed to compensate a damaged party for the loss of use or unlawful detention of money...." *Perkins School for the Blind v. Rate Setting Commission*, 383 Mass. 825, 835, 423

---

breach of Continental's contract until after the John Hancock suit was filed in 1975. Given the apparent contradiction in these two comments by the court, we are unwilling to rely on one or the other as establishing the date of breach.

6. In fact, just a few days before the requests to charge were filed, Liberty submitted a motion for summary judgment seeking interest only from the dates of payment.

7. Continental's alternative position is that interest should be measured from the date this action was filed, April 20, 1983. Such a step should be taken, as the language of section 6C itself suggests, only as a matter of last resort. To assess from the date of filing in this case, for example, would be to grant Continental a windfall even greater than that which would befall Liberty if interest on the full award of $1.29 million were assessed from June 8, 1973, *see* discussion in text, *infra*.

N.E.2d 765, 772 (1981); *accord Mirageas v. Massachusetts Bay Transportation Authority*, 391 Mass. 815, 821, 465 N.E.2d 232, 236 (1984) ("[T]he interest afforded by [section 6B, which governs *tort* actions,] is not a penalty. It is awarded to compensate for the delay in the plaintiff's obtaining his money."). Were interest on the full amount of the verdict to be assessed from June 8, 1973, or even from the end of 1975, the windfall accorded to Liberty would amount to hundreds of thousands of dollars. Such a result would defeat the purpose of section 6C.

■ Accordingly, although the district court's memorandum decision was based upon only part of the above reasoning, we conclude that it should be affirmed. The absence of a formal finding as to a single date of breach, the nature of the relief sought by Liberty throughout most of these proceedings, the clear determination of dates that are, in essence, dates of demand, and the stated purpose of section 6C all argue for the assessment of interest from the dates of payment.[8]

## C. Fees and Expenses Incurred Before John Hancock Filed Suit

Of the total of $1.75 million in fees incurred by Robertson and Liberty, somewhere between $13,500 and $37,000, was for services rendered before the John Hancock suit was filed.[9] Continental, in its appeal, claims that the jury should have been told that these services were not to be considered because they were incurred before Continental's duty to defend Robertson arose. The court refused to so instruct the jury and the jury evaluated these expenditures, as well as the post-filing expenditures, for their reasonableness.

Continental bases its claim primarily on the following language in the policy: "the [insurer] shall have the right and duty to defend *any suit* against the insured...." Continental claims that, under these terms, the duty to defend could not have arisen until the first suit was filed, citing to *Marvel Heat Corp. v. Travelers Indemnity Co.*, 325 Mass. 682, 685, 92 N.E.2d 233, 234–35 (1950), *Haines v. St. Paul Fire & Marine Insurance Co.*, 428 F.Supp. 435, 438 (D.Md.1977); *also* 14 G. Couch, Cyclopedia on Insurance 2d § 51:43, at 457.

While we do not disagree with this general proposition or with the cited authorities, we find that neither are particularly helpful in addressing the narrow question posed here. In *Marvel* and *Haines*, the respective courts were trying to answer the question of whether the duty to defend had ever arisen. Indeed, the *Marvel* court stated explicitly that there was no evidence that an action had ever been brought against the insured, and the court noted that it was not dealing with a situation in which the insurer had refused to defend. 325 Mass. at 684–85, 92 N.E.2d at 234–35. Here, by contrast, the fact that Continental had breached its duty to defend was already established. The only issue remaining was whether the fees that Robertson

---

8. We acknowledge that this decision, at least at first glance, appears to be contrary to *Sterilite Corp. v. Continental Casualty Co.*, 20 Mass.App. 215, 479 N.E.2d 205 (1985) (interest assessed from date of breach of duty to defend, not from dates of payments of attorney's fees), which was decided and brought to our attention long after oral argument was heard in this case. For two major reasons, however, *Sterilite* has not prompted us to revise our thinking. First, as the Appeals Court of Massachusetts itself emphasized, the date of the insurer's breach was clearly established in *Sterilite*. Second, we find in that decision no suggestion that either the parties or the court considered the possibility that the dates of payment could, under the particular circumstances, be considered as dates of constructive demand. Had the Appeals Court

done so, we are not convinced that it would have reached the same result that it did, for only by so viewing the dates of payment is it possible to achieve both compliance with the literal language of section 6C and fulfillment of its essential purpose of compensating the non-breaching party for the loss of the use of its money.

9. Only three of the bills, totaling $13,445.78, were submitted before September 15, 1975, when the John Hancock suit was filed. Two others, totaling $23,589.31, while submitted three months after that date, included some charges for services rendered before the suit was filed.

incurred in anticipation of the John Hancock and Mama Leone suits should have been considered as part of the fees reasonably incurred by Robertson in conducting its own defense.

■ Under the circumstances of this particular case, we hold that the pre-suit services were correctly considered as part and parcel of the defense against the liability suits. John Hancock made its initial claim no later than June 1, 1973, and Continental was notified of it immediately thereafter. The extent of the window problem was so great that it was almost certain that a suit would be filed. Indeed, John Hancock and Robertson, as well as others involved in the construction of the Hancock Tower, entered into an agreement to delay the filing of any suits until after further efforts were made to solve the immediate problems posed by the defective curtain wall. Without this agreement, the suit would have been filed much sooner, in which case the technical issue now before us probably would not have arisen. Finally, both the exhibits and the testimony of witnesses strongly suggest that most, if not all, of the pre-suit services would have been performed after suit was filed had they not been performed before and that the insurance experts felt that Robertson had little choice but to retain counsel and prepare to defend itself when it did. Under these particular circumstances, we conclude that it was not error to allow the jury to evaluate the pre-suit services and charges for their reasonableness. *Cf. Walters v. American Insurance Co.*, 185 Cal.App.2d 776, 785–86, 8 Cal.Rptr. 665, 671–72 (1960) (plaintiff, insured under policy similar to that found here, allowed to recover costs of reaching settlement after insurance claim was filed but before suit could be commenced where evidence established the need to settle quickly to minimize losses and costs).

D. *Fees Attributable to the Declaratory Judgment Action*

At the outset of the trial the district court ruled that Continental was responsible not only for the reasonable cost of defending Robertson in the two liability suits but also for the cost of defending Robertson in the declaratory judgment action. Thereafter, although considerable evidence as to the cost of the declaratory judgment action was admitted, the court ultimately limited Continental's efforts to establish a precise figure. Continental made timely objections to these rulings and on appeal argues two points: first, that the fees incurred in defending the declaratory judgment were not, as a matter of law, recoverable from Continental; and second, that because no sum certain was established for these fees, a new trial must be ordered for a completely new determination of what fees were reasonably incurred in the two liability actions alone.

We turn first to the question of the recoverability of these fees. Both parties agree that Massachusetts law governs. They also agree that Continental, although adjudged to lack legal excuse for denying coverage of the John Hancock and Mama Leone claims, did not act in bad faith or vexatiously. Where they disagree is over Liberty's claim, and the district court's implicit conclusion, that the attorney's fees incurred in defending the declaratory judgment action were equivalent to damages caused by Continental's breach of contract and that as such they are recoverable.

There are substantial arguments to be made on both sides of this issue. On the one hand, it can be argued that the insurer should not be allowed lightly to force the insured to undergo substantial expense to prove that it had bought what it thought it had bought, i.e., the privilege of being defended by the insurer. Suits by the insurer challenging coverage are not to be encouraged. And the insurer, presumably being the expert in matters of coverage, should bear the risk of an unsuccessful challenge to coverage.

On the other hand, it can at least equally well be argued that unfairness can be controlled by confining the insured's recovery to cases involving bad faith or vexatious litigation. In addition, the principle that a

party should not be unduly deterred from seeking court resolution of a genuine coverage dispute counsels caution in the judicial inauguration of a rule allowing recovery in these circumstances. It must not be forgotten that the general "American Rule" is not to award attorney's fees to the prevailing party. *See, e.g., Bournewood Hospital, Inc. v. Massachusetts Commission Against Discrimination,* 371 Mass. 303, 308, 358 N.E.2d 235, 238 (1976).

■ Absent a dominance of policy or logic favoring one side or the other, we conclude that we must follow the rather clearly negative signals of the Massachusetts Supreme Judicial Court, which has taken a restrictive view of allowing attorney's fees, both in general terms, *id.* at 310–13, 358 N.E.2d at 239–41, and specifically with regard to declaratory judgment actions, *see, e.g., Fuss v. Fuss,* 372 Mass. 64, 70–72, 368 N.E.2d 271, 274–76 (1977). The case principally relied on by Liberty for the proposition that counsel fees may be considered an element of damages caused by a party's "wrongful conduct", *Wheeler v. Hanson,* 161 Mass. 370, 376, 37 N.E. 382 (1894), is critically distinguishable from this case. The plaintiff in *Wheeler* brought and proved a claim of malicious prosecution, an element clearly lacking here. In addition, the Massachusetts Supreme Judicial Court has since commented that *Wheeler* was an exceptional case and that more recently the court has taken " 'a restrictive view of the right of a successful litigant to recover counsel fees from one who has wronged him.' " *Bournewood Hospital,* 371 Mass. at 312–13, 358 N.E.2d at 240–41 (quoting *Harrison v. Textron, Inc.,* 367 Mass. 540, 554, 328 N.E.2d 838, 846 (1975), and citing among other cases *Wachusett Regional School District Committee v. Erickson,* 354 Mass. 768, 238 N.E.2d 369 (1968), in which attorney's fees were refused in a

declaratory judgment context). We´ therefore hold that the district court erred in ruling that Liberty was entitled to recover the reasonable attorney's. fees attributable to defending the declaratory judgment action.[10]

This holding necessarily brings us face to face with the question of whether the services performed on and fees paid for the defense of the declaratory judgment action were sufficiently established in the record to obviate the need to retry the entire case. Looking to the record, we find that the following evidence was admitted. Between April of 1976, when the declaratory judgment action was commenced, and the beginning of 1983, Goodwin, Procter & Hoar did not keep time records that precisely segregated the time spent on that action from the time spent on the two liability suits. Prior to methodically reconstructing such records, Attorneys Ware and Feeherry of Goodwin, Procter & Hoar roughly estimated that between $150,000 and $155,000 was spent on the declaratory judgment action. Subsequently, a nonlawyer assistant was asked to "generate some hard information" by "looking ... at the diaries and printouts". As the result of this effort, Goodwin, Procter & Hoar notified Liberty in January of 1983 that the "best estimate" of the declaratory judgment fees incurred between 1976 and 1982 was $81,766. Additional fees incurred in 1983, which were calculated from separately recorded time sheets, were $34,389.12, making the total amount of fees for the declaratory judgment $116,155.12. More than a year later, in an answer to an interrogatory, Liberty stated that it was then "informed by the law firm of Goodwin, Procter & Hoar that $146,757.67 is attributed to the Continental Declaratory Judgment Action". Still two weeks later, on June 13, 1984, Liberty amended its answer by indi-

---

**10.** Our confidence in reaching this result is strengthened by our observation that the clear majority of jurisdictions which, unlike Massachusetts, have considered the precise issue of whether an insured can recover the cost of defending an insured's unsuccessful declaratory judgment action have disallowed such recovery.

*See, e.g., Annot.,* "Insured's Right to Recover Attorney's Fees Incurred in Declaratory Judgment Action to Determine Existence of Coverage Under Liability Policy", 87 A.L.R.3d 429, 437–441 (1978); 7C J. Appleman, *Insurance Law and Practice* § 4691, at 281–83 & nn. 96–98. (1979)

cating that it had been "informed by ... Goodwin, Procter & Hoar that $116,155.12" was the proper amount.

As this summary of the evidence reveals, although counsel for Continental was precluded by the district court from continuing to probe into the methods and assumptions leading to the "best estimate" of $116,155, the maximum and minimum figures were clearly put into evidence. We conclude, therefore, that the record provides a sufficient basis for conditioning the holding of a new trial on Liberty's declining to remit a portion of the total amount awarded by the jury. The pertinent application of the general practice of remittitur has been well stated:

> "Remittitur is not only used by the trial courts, but also by the appellate courts in two general areas, one particularly applicable to the function of the appellate court, the other quite similar to its use by the district courts. In the first area, where reversible error is found in the proceedings below, such as erroneous admission of evidence or erroneous instructions, and the effect of the error can be reasonably approximated to a definite portion of the amount of the verdict, the appellate court may condition its affirmance on the plaintiff remitting that amount of the verdict which is apparently traceable to the error below. *Even when the effect of the error cannot be allocated to a distinct portion of the verdict, remittitur may still be used if the maximum effect of the error can be established.* In this way, the defendant cannot complain as the maximum effect of the error is avoided; and the plaintiff has his choice of electing to remit or to suffer a new trial." 6A J. Moore, J. Lucas, & G. Grotheer, Moore's Federal Practice ¶ 59.08[7], at 59–208–210 (footnotes omitted) (emphasis added).

These principles have been applied in a number of cases,[11] including *Kropp v. Zie-*

barth, 601 F.2d 1348, 1354–55 (8th Cir. 1979); *Durant v. Surety Homes Corp.*, 582 F.2d 1081, 1086–87 (7th Cir.1978); *cf. Arnold v. Eastern Air Lines, Inc.*, 681 F.2d 186, 206 (4th Cir.1982) (court recognized remittitur to be appropriate where "the amount of the award traceable to [an] error ... can be capped by a maximum figure through resort to the trial record", but the court could not establish such a figure from the record at hand).

In this case, we are faced with a range of figures, from the so called "best estimate" of $116,155 to the rough estimate of $150,000 to $155,000. It seems to us exceedingly improbable that, on retrial, a figure in excess of $155,000 would be proven as attributable to time spent on the declaratory judgment action. The 1983 figure of $34,389.12 is quite reliable because it is derived from separately kept time records. If that figure is subtracted from the greatest estimate of $155,000, we obtain a figure of $120,610.88 for the years 1976 through 1982, when the time entries for the three suits were undifferentiated. This figure, in turn, is almost 50% greater than the "best estimate" of $81,766 for that period.

In addition, we note that the figure of $155,000 makes sense when compared to the $184,351.63 that Continental paid its counsel for prosecuting the declaratory judgment action. Continental admitted during trial that it was at all times represented by the senior partner of Burns and Levinson, while most of Robertson's and Liberty's representation was performed by a young lawyer at Goodwin, Procter & Hoar. Under these circumstances, one would expect Liberty's attorney's fees to be significantly less than Continental's.

With these considerations in mind, we conclude that remittitur is appropriate and order that there be a retrial of the case only if Liberty chooses not to remit the sum of $155,000. It may very well be that

---

11. That our role in applying remittitur is a matter of federal law seems clear. *Donovan v. Penn Shipping Co., Inc.*, 429 U.S. 648, 649, 97 S.Ct. 835, 836, 51 L.Ed.2d 112 (1977); *Kazan v. Wolinski*, 721 F.2d 911, 913 (3d Cir.1983)

Liberty will prefer a retrial, either because it believes it can prove that the declaratory judgment fees are much lower or because it thinks retrial of the whole case will result in a substantially higher award. The Seventh Amendment accords the plaintiff the privilege of making such a choice, but if it opts instead to remit $155,000 (plus any interest thereon) from the general verdict of $1.29 million, we do not see how Continental could be prejudiced.

E. *Continental Not Prejudiced by Comments of the District Court*

Continental's final claim is that a new trial must be granted because of the prejudice it suffered as a result of certain allegedly intemperate remarks made by the district court to Continental's counsel in the presence of the jury. This claim is so lacking in merit that we see no point in belaboring it by recounting the particular exchanges that Continental finds objectionable. Even if we were able to characterize any of the court's remarks as intemperate or discourteous, none of them alone or in combination could be viewed as rendering the trial unfair. *See Westminster Electric Corp. v. Salem Engineering & Construction,* 712 F.2d 720, 723 (1st Cir.1983); *Goldman v. Fenn,* 252 F.2d 47 (1st Cir. 1958). Although there are a number of points we could make to establish the lack of prejudice to Continental, we think it enough to note that the jury awarded Liberty almost $500,000 less than the total amount of fees that it actually incurred. This fact by itself demonstrates that the jury was fully receptive to the case put forward by Continental.

*Accordingly, the district court is affirmed in all respects except for its ruling on the recoverability of attorney's fees incurred in the declaratory judgment action. A new trial shall therefore be ordered only if Liberty decides not to remit $155,000 (plus any interest awarded thereon) from the general verdict of $1,290,000. No costs.*