# United States Court of Appeals
## For the First Circuit

No. 00-1928
No. 00-1929

SAINT-GOBAIN INDUSTRIAL CERAMICS INC.,

Plaintiff, Appellant/Cross-Appellee

v.

WELLONS, INC.,

Defendant, Appellee/Cross-Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Lynch, Circuit Judge,
Bownes, Senior Circuit Judge,
and Lipez, Circuit Judge.

Kenneth I. Levin, with whom Paul G. Morrissey and Pepper Hamilton LLP, were on brief, for appellant.

James A. G. Hamilton, with whom Susan E. Stenger, Andrew F. Caplan, and Perkins, Smith & Cohen, LLP, were on brief, for appellee.

April 26, 2001

_____

**LYNCH, Circuit Judge**.  Tighter environmental regulations at times force businesses to try new methods and technologies to meet more stringent requirements.  In this case, one of those technologies failed -- ceramic tubes made by Saint-Gobain Industrial Ceramics Inc.  The tubes were used by Wellons, Inc. in high temperature heat exchanges, part of a new system to dry wood chips.  In the ensuing litigation, Wellons was awarded some but not all of what it sought.  Saint-Gobain, in turn, objects to the amount of Wellons' prejudgment interest award.  Consequently, we examine Massachusetts commercial law, particularly as to awards of prejudgment interest.  We affirm the denial of Wellons' claim for relief under Mass. Gen. Laws ch. 93A and reverse and remand on the prejudgment interest award.

## I.

On November 14, 1997, Saint-Gobain filed for declaratory relief that it was not liable under warranties it provided in the contract selling the tubes to Wellons.  Saint-Gobain claimed that the breakage was not caused by a defect in the tubes and that, in any event, Wellons had failed to make a demand for repair or replacement as required by the warranty.  Wellons filed a counterclaim for breach of warranty and revocation of acceptance, seeking as damages over $1.9 million, the full purchase price of the ceramic tubes.

At trial, the jury returned a verdict in favor of Wellons on its warranty claim, finding that the limited repair and replacement

3

remedy agreed to by the parties in the contract failed to fulfill its essential purpose. The jury awarded Wellons $650,000 in damages, not the full purchase price. The jury also ruled against Wellons on its revocation of acceptance claim. The district court denied Wellons' claim that Saint-Gobain had violated Chapter 93A of the Massachusetts Consumer and Business Protection Act, Mass. Gen. Laws ch. 93A, §§ 2, 11. The district court also awarded Wellons prejudgment interest from December 31, 1995, the date by which the parties agreed delivery of all the tubes was complete.

Saint-Gobain appealed the district court's prejudgment interest award on the ground that such interest should be awarded from December 8, 1997, the date Wellons filed its claim, since the date of breach had not been found by the jury as required by statute. Wellons cross-appealed from the denial of its Chapter 93A claim.

## II.

We describe the facts as found by the district court or as agreed to by the parties. Wellons is an Oregon-based company that designs and builds energy and drying systems for the forest products industry. In late 1992, in response to air emissions regulations, Wellons developed a new system for drying wood chips, which used high temperature air heaters, known as heat exchangers. Wellons contracted with Georgia-Pacific Corp. to build the energy and drying systems of two large prototype facilities that would manufacture a kind of

4

building panel called oriented strand board.  One facility was located in Mt. Hope, West Virginia, and the other in Brookneal, Virginia.  Wellons agreed to supply heat exchangers as part of these systems.

Around April 1993, Mark Chenard, an engineer for Wellons, approached Kevin Coston, a senior applications engineer for Saint-Gobain, a ceramics manufacturer based in Worcester, Massachusetts.  Chenard asked Coston about the use of ceramic tubes for the heat exchangers Wellons had agreed to design.  Chenard told Coston and other Saint-Gobain engineers that the ceramic tubes would be exposed to combustion gases with an operating range of temperatures between 1600 degrees Fahrenheit at the inlet to 1430 degrees Fahrenheit at the exit of the tube bank.  He also said that the system would have an abort device to prevent temperatures from exceeding 1800 degrees.

Saint-Gobain initially recommended its silicon carbide product, CRYSTAR.  Chenard told Coston that CRYSTAR was too expensive and would put Wellons over-budget.  Chenard asked, instead, about a less expensive product.  Coston, after investigation, told Chenard about a nitride-bonded silicon carbide product known as ADVANCER that was typically used in roll form in roller hearth kiln applications.  He cautioned that ADVANCER had not been previously used for heat exchanger tubes and that ADVANCER was more porous than CRYSTAR, making ADVANCER more susceptible to oxidation.  But Coston also suggested that refiring ADVANCER might result in improved resistance to oxidation.  Ultimately,

5

the heat exchanger design called for CRYSTAR tubes to be installed in the two rows of the heat exchangers where the highest temperatures were expected and for ADVANCER tubes to be installed in the remaining twenty-six rows. There were additional issues before the parties actually contracted for the purchase and sale of the tubes.

Because oxidation was a concern, that topic was discussed in July 1993 among Saint-Gobain, Wellons, and Georgia-Pacific representatives. Coston had provided Chenard with Saint-Gobain technical literature about oxidation of silicon carbide materials like CRYSTAR at temperature ranges between 1560 degrees Fahrenheit and 2010 degrees Fahrenheit, but not with any such literature about oxidation of nitride-bonded silicon carbide materials like ADVANCER or refired ADVANCER.

Saint-Gobain wanted to perform additional tests on the tube materials, and at the July 1993 meetings it was agreed that sample tubes would be inserted in the ductwork at an existing Georgia-Pacific plant in Skippers, Virginia. The energy system had been installed by Wellons but did not employ the same heat exchanger technology contemplated for the Mt. Hope and Brookneal facilities. Saint-Gobain was told that the conditions in the ducts at Skippers were equivalent to or more severe than what could be expected at the Mt. Hope and Brookneal facilities. The first stage of testing at Skippers was concluded in late 1993, and the tubes, after removal, showed no visible

6

signs of deterioration (although Wellons asserts that they did show alkali metal deposits, i.e., sodium and potassium compounds).

Georgia-Pacific and Wellons also made their own investigation of the proposed use of ADVANCER in the system, hiring Dr. Charles E. Semler, a former university professor and past president of the American Ceramics Society. Dr. Semler's report dated February 18, 1994, indicated satisfaction with the tube material selections for the normal anticipated operating temperatures, but warned that the tubes could fail if exposed to temperatures above the normal expected range (1080-1300 degrees Fahrenheit air temperatures and 1430-1600 degrees Fahrenheit exhaust gas temperatures), especially as the temperatures approached 1800 degrees Fahrenheit, or if exposed to rapid decreases of temperature caused by exposure to ambient air while the tubes were still hot (also known as thermal shocking).

On March 10 and 21, 1994, Wellons issued purchase orders to Saint-Gobain for ceramic tubes to be installed in the Mt. Hope and Brookneal facilities. The purchase orders included warranties proposed by Saint-Gobain and specifically negotiated by the parties. Saint-Gobain warranted that the ceramic tubes would operate without failure for a period of one year from the date of Georgia-Pacific's acceptance of the tubes or eighteen months from the date of completed installation, whichever was sooner. The warranty provided that in the event of breach Saint-Gobain's sole obligation was to replace the

7

tubes.  However, the warranty also provided that Saint-Gobain would not be responsible for total or partial failure resulting from occurrences such as improper operation, operating conditions beyond those for which the plant was designed, acts of god, etc.  Saint-Gobain also reserved the right to review operating data and/or employ the services of an expert third party to determine whether proper operating procedures were followed during the warranty period and to be given the opportunity to make any repairs or replacement it deemed reasonable and appropriate to meet the terms of the warranty.

The Mt. Hope facility began operation in July 1995 and the Brookneal facility in December 1995.  At a meeting on February 29, 1996, Georgia-Pacific representatives informed Chenard and James Lashbrook, a Senior Applications Engineer for Saint-Gobain, that increasing incidents of breakage of ADVANCER tubes had occurred: broken pieces of the tubes, cracked and with holes, were showing up in the ash hoppers at both sites.  In the Spring of 1996, the ceramic tubes began to fail in substantial numbers.  By June of 1996, Saint-Gobain recognized that a tide of failures had occurred.

From March until early June 1996, Saint-Gobain employees visited the facilities, inspected the heat exchangers and failed tubes, interviewed Georgia-Pacific employees about operating conditions and any unusual occurrences, and took tube samples back to Worcester for analysis.  Saint-Gobain's laboratories reported inconclusive results as

8

to the causes of the failure of the tubes.  Its marketing manager informed Chenard that Saint-Gobain still did not know what was causing the tubes to fail.

There was conflicting expert testimony as to the causes of failure.  Wellons' expert witness opined that sodium and potassium compounds in the combustion gases oxidized the material.  In contrast, Saint-Gobain's expert witness found the cracking patterns in the tubes to be consistent with thermal shocking and the cristobalite levels to be consistent with exposure to temperatures in excess of 1800 degrees Fahrenheit -- the anticipated top potential temperature of the systems.

On June 26, 1996, Chenard informed Saint-Gobain that all the ceramic tubes in the units at Mt. Hope and Brookneal would be replaced with metal tubes and demanded a refund to Wellons of more than $1.9 million, the full purchase price of the tubes. Removal of the tubes began later that year.

## III.

Saint-Gobain appeals the district court's decision to award Wellons prejudgment interest from December 31, 1995, the date by which delivery of all the tubes was complete. Wellons cross-appeals the dismissal of its claim of unfair or deceptive business practices under Mass. Gen. Laws ch. 93A.

## A. Prejudgment Interest Under Mass. Gen. Laws ch. 231, § 6C

The district court awarded Wellons prejudgment interest from

the date of delivery of the tubes (December 31, 1995), which the district court equated with the date of breach of warranty, rather than from the date Wellons filed its claims in this action (December 8, 1997).  We review the district court's legal conclusions de novo.  See, e.g., Industrial Gen. Corp. v. Sequoia Pac. Sys. Corp., 44 F.3d 40, 43 (1st Cir. 1995).

The district court applied the Massachusetts prejudgment interest statute, Mass. Gen. Laws ch. 231, § 6C,[1] which provides that

> In all actions based on contractual obligations, upon a verdict, finding or order for judgment for pecuniary damages, interest shall be added by the clerk of the court to the amount of damages, at the contract rate, if established, or at the rate of twelve per cent per annum, from the date of the breach or demand.  If the date of the breach or demand is not established, interest shall be added by the clerk of the court, at such contractual rate, or at the rate of twelve per cent per annum from the date of the commencement of the action . . . .

Mass. Gen. Laws ch. 231, § 6C.  The statute requires that where the date of the breach or demand "is not established" prejudgment interest must be awarded from the date the claim was filed.  Here, Wellons never sought a jury determination on the date of breach. The district court concluded, however, that "the date of breach can be established from the undisputed facts."  Saint-Gobain Indus. Ceramics Inc. v. Wellons,

---

[1]     In a diversity action, such as the present one, state law must be applied in determining "whether and how much pre-judgment interest should be awarded."  Fratus v. Republic Western Ins. Co., 147 F.3d 25, 30 (1st Cir. 1998).

Inc., 98 F. Supp. 2d 117, 118 (D. Mass. 2000). Specifically, the court found that "tender of delivery was made no later than December 31, 1995, the date of commencement of operations at the Brookneal facility and that prejudgment interest should accrue from that date." Id. It thus concluded that as a matter of law the date of breach of contractual warranties under section 6C is the date of tender of delivery.

Saint-Gobain argues that the district court erred because the Massachusetts Supreme Judicial Court's decision in Deerskin Trading Post, Inc. v. Spencer Press, Inc., 495 N.E.2d 303 (Mass. 1986), establishes a bright-line rule that, in the absence of a specific finding by the trier of fact, prejudgment interest must be assessed from the date of filing, even where the evidence is arguably sufficient to establish breach or demand at an earlier date. See id. at 308.

In Deerskin, the SJC affirmed an award of prejudgment interest to Spencer Press on its counterclaim from the date that the counterclaim was filed since the date of breach or demand had not been established at trial. Id. The SJC held that establishing the date of breach or demand "is a determination for the trier of fact, and, where trial has proceeded before a jury, neither the judge nor an appellate court can make such a determination." Id. The SJC concluded that there had been no finding as to the date of breach or demand, nor had Spencer Press objected to the judge's failure to instruct the jury to

11

so find.  Id.; see also Karen Constr. Co. v. Lizotte, 484 N.E.2d 1011, 1015 (Mass. 1985) ("The date of an alleged breach is a question of fact for the trier of fact . . . . Neither this court nor the trial judge is permitted to determine when the breach occurred.") (internal citations omitted).

Wellons argues that here, in contrast to Deerskin where the date of demand seemed to be in dispute, see 495 N.E.2d at 305-06, the date of breach or demand was essentially admitted by the parties in the pleadings.  Wellons argues that because (1) the parties agreed as to the date of delivery (complete by December 31, 1995), and (2) the date of delivery is tantamount to the date of breach of warranty for the tubes, (3) the date of breach is therefore "established" within the meaning of section 6C, notwithstanding the absence of a specific jury finding on point.  Wellons maintains that Deerskin requires a separate finding by the trier of fact only where the date of breach or demand is actually in dispute or otherwise ambiguous.  Cf. Karen Constr. Co., 484 N.E.2d at 1012-14 (pre-Deerskin case referring to "alleged date of breach" in dispute involving owner's refusal to pay builder balance on several installments of contract; concluding that date of breach had not been established at trial and awarding prejudgment interest from date complaint was filed); Graves v. R.M. Packer Co. 702 N.E.2d 21, 29 (Mass. App. Ct. 1998) (post-Deerskin case where there was no admission as to the date of breach of oral contract to repair and maintain

12

underground storage tank; upholding award of prejudgment interest from date of commencement of the action).

In <u>Deerskin</u>, the SJC established a bright-line rule mandating an award of prejudgment interest under the statute from the date of commencement of the action where "the demand of breach or demand is <u>not established</u>."  495 N.E.2d at 308 (emphasis added); <u>see</u> <u>also</u> <u>Siegel</u> v. <u>Kepa Homes Corp.</u>, No. 9646, 2000 WL 798639, at *4 (Mass. App. Div. June 15, 2000) (parties agree that prejudgment interest must be assessed from date of demand, not from date of apparent contract breach, absent any specific finding by the jury).  While we agree that a date of breach can be established by agreement of the parties (point one of Wellons' syllogism), there was no such agreement here.[2]  More importantly, it is far less certain that the legal proposition (point two of Wellons' syllogism) is correct.  We are being asked here essentially to carve out a general exception to <u>Deerskin</u> for breach of warranty claims.

While Massachusetts may one day chose to adopt the U.C.C. rule that the date of breach of warranty is the date of delivery of the goods <u>for purposes of awarding prejudgment interest under section 6C</u>,

---

[2]    Wellons argues that Saint-Gobain admitted the date of breach in its pleadings to the district court, and should be held to that admission under the principles and policies governing the Federal Rules of Civil Procedure.  All Saint-Gobain admitted, however, was the date of delivery; what Wellons calls Saint-Gobain's "admission" as to the date of breach could more accurately be described as Wellons' own conclusion of law, which we do not adopt.

13

it has yet to do so.  And we, as a federal court, will not depart from

Deerskin to craft such a new rule,[3] a decision that involves competing

policy considerations better left to the state.  We outline some of

those competing considerations.

Section 2-725(2) of the U.C.C. provides in relevant part that

"[a] breach of warranty occurs when tender of delivery is made, except

that where a warranty explicitly extends to future performance of the

goods and discovery of the breach must await the time of such

performance the cause of action accrues when the breach is or should

have been discovered." U.C.C. § 2-725(2); Mass. Gen. Laws ch. 106, §

2-725(2) (adopting U.C.C. § 2-725(2)).  Assuming arguendo that the

section applies, this provision describes when a breach of warranty

claim accrues for statute of limitations purposes.  See Wilson v.

Hammer Holdings, Inc., 850 F.2d 3, 4-5 (1st Cir. 1988); Bay State-Spray

& Provincetown Steamship, Inc. v. Caterpillar Tractor Co., 533 N.E.2d

---

[3]      Wellons relies on Liberty Mutual Ins. Co. v. Continental
Cas. Co., 771 F.2d 579 (1st Cir. 1985), a pre-Deerskin case
interpreting Massachusetts law and affirming an award of prejudgment
interest on the payment of legal fees from the date the fees were
paid and not from the (earlier) date of alleged breach by the
insurance company of its duty to pay.  See 771 F.2d at 583-85.
However, in Liberty Mutual Ins., the court did not, as Wellons
suggests, carve out an exception to the plain language of section 6C
but rather concluded that the dates the legal fees were paid -- that
is, the dates of the actual injury -- were essentially equivalent to
the dates "of demand" under the statute.  See id. at 584.

1350, 1353, 1355 (Mass. 1989).[4] There may be very sound reasons for not using a statute of limitations trigger provision for breach of warranty claims in order to establish the "date of breach" as a matter of law for purposes of calculating prejudgment interest under section 6C. Indeed, in Deerskin, prejudgment interest was assessed from the (later) date of the filing of the counterclaim even though that claim had presumably accrued for statute of limitations purposes upon the (earlier) date of delivery of the defective sales catalogs and accompanying order forms.

Furthermore, making the date of delivery the date of breach for prejudgment interest purposes would, at least in some instances, contravene section 6C's intent to avoid windfalls to plaintiffs to the extent they have not actually incurred a loss. In Sterilite Corp. v. Continental Cas. Co., 494 N.E.2d 1008 (Mass. 1986), a pre-Deerskin case, the SJC stated that it would not adopt the literal meaning of section 6C "without regard for [its] purpose and history." Id. at 1009. Although section 6C did away with the common law rule of calculating prejudgment interest based on whether the damages were liquidated or unliquidated, the statute retained the rule's basic purpose, which was "to compensate a damaged party for the loss of use

---

[4]     The Official Comment to U.C.C. § 2-725 states that its purpose is "[t]o introduce a uniform statute of limitations for sales contracts, thus eliminating the jurisdictional variations and providing needed relief for concerns doing business on a nationwide scale."  U.C.C. § 2-725, cmt.

15

or unlawful detention of money." Id. at 1011 (quoting Perkins School for the Blind v. Rate Setting Comm'n, 423 N.E.2d 765, 772 (Mass. 1981)).  The SJC concluded that prejudgment interest under section 6C was due from the date Sterilite was actually deprived of use of its money by paying the legal expenses, and that any other rule "would result in a windfall" to Sterilite in contravention of the statute's purpose.  Id.; see also Liberty Mut. Ins., 771 F.2d at 584-85 (consistent with equitable purpose of section 6C to award prejudgment interest on legal fees defendant was supposed to have paid from date those fees were actually paid, and not from the earlier date when defendant indicated it was not obligated to pay them).[5] On the other hand, Wellons' proposed rule is easy to administer and provides a great deal of certainty, and certainty has considerable value to the business community.

_____

[5]    Here, awarding Wellons prejudgment interest from the date of delivery risks the type of windfall cautioned against in Sterilite.  For example, it is unclear exactly when Wellons incurred the costs of replacing the ceramic tubes, though it is clear that Wellons did not incur those costs until sometime after delivery.  In addition, the record does not indicate what portion of the cost of replacing the tubes was payed by Wellons and what portion was paid by Georgia-Pacific under their allocation agreement.  Although Wellons claims its "loss" of the money occurred when it decided to purchase the original tubes, and not when it later paid for replacement tubes, it does not necessarily follow that this was the "loss" the jury compensated Wellons for in its damage award.  Indeed, if the loss the jury had in mind was the original purchase price of over $1.9 million -- the amount of damages sought by Wellons -- the jury's award presumably would have reflected as much.  Instead, the jury awarded Wellons $650,000, a sum much closer to the $620,000 it was estimated to have cost to replace the defective tubes.

The district court relied on the pre-Deerskin decision in United California Bank v. Eastern Mountain Sports, Inc., 546 F. Supp. 945 (D. Mass. 1982), aff'd, 705 F.2d 439 (1st Cir. 1983). That was a federal case attempting to predict Massachusetts law. United California Bank is distinguishable on at least two grounds. First, United California Bank was a bench trial, not a jury trial, and so in that sense remains consistent with Deerskin's requirement that the date of breach or demand be established by the trier of fact. See Deerskin, 495 N.E.2d at 308. Accord Alperin v. Eastern Smelting & Refining Corp., 591 N.E.2d 1122, 1126 (Mass. App. Ct. 1992) (upholding trial judge's findings as to prejudgment interest awarded on breach of contract claim). Second, awarding prejudgment interest from the date of delivery in United California Bank did not, as it could do here, create a potential windfall because there the goods were in fact defective on delivery, and so the relevant loss was incurred at that time.

The district court erred in awarding Wellons prejudgment interest from the date of delivery (December 31, 1995), and prejudgment interest should be awarded from the date Wellons filed its counterclaim (December 8, 1997).

B.  Chapter 93A Claim

Wellons appeals the district court's determination that Saint-Gobain did not commit unfair or deceptive business practices

17

under Chapter 93A.[6]

We review the district court's findings of fact for clear error and its conclusions of law de novo.  See, e.g., Commercial Union Ins. Co. v. Seven Provinces Ins. Co., 217 F.3d 33, 40 (1st Cir. 2000); Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d 47, 54 (1st Cir. 1998).  "Although whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact, the boundaries of what may qualify for consideration as a c.93A violation is a question of law."  Commercial Union Ins., 217 F.3d at 40 (quoting Schwanbeck v. Federal-Mogul Corp., 578 N.E.2d 789, 803-04 (Mass. App. Ct. 1991)).

Section two of Chapter 93A makes it unlawful to engage in "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Mass. Gen. Laws ch. 93A, § 2.  Section 11 extends section 2's general protection to commercial parties.  Id. ch. 93A, § 11.  "The objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce."  Cambridge Plating Co. v. Napco, Inc., 85 F.3d 752, 769 (1st Cir. 1996) (quoting Levings v. Forbes & Wallace, Inc., 396 N.E.2d 149, 153 (Mass. App. Ct. 1979));

_____

[6]    Wellons seeks only that this court reverse the district court's dismissal of its Chapter 93A claim and remand for determination of an award of attorneys' fees and costs under section 11 of Chapter 93A.

18

see also Commercial Union Ins., 217 F.3d at 40 ("We focus on the nature of the challenged conduct and on the purpose and effect of that conduct as the crucial factors in making a G.L. 93A fairness determination.") (quoting Massachusetts Employers Ins. Exch. v. Propac-Mass, Inc., 648 N.E.2d 435, 438 (Mass. 1995)). While Chapter 93A "was designed to encourage more equitable behavior in the marketplace and impose liability on persons seeking to profit from unfair practices, . . . . [it] does not contemplate an overly precise standard of ethical or moral behavior." Arthur D. Little, 147 F.3d at 55 (internal quotation marks and citations omitted). Nevertheless, it is clear that "Chapter 93A liability may exist if the defendant's conduct falls 'within at least the penumbra of some common-law, statutory, or other established concept of unfairness' or is 'immoral, oppressive or unscrupulous.'" PMP Assoc., Inc. v. Globe Newspaper Co., 321 N.E.2d 915, 917 (Mass. 1975), quoted in Cambridge Plating, 85 F.3d at 769; see also VMark Software, Inc. v. EMC Corp., 642 N.E.2d 587, 595 (Mass. App. Ct. 1994).

A breach of warranty alone does not necessarily give rise to a Chapter 93A violation. "Rather, the question of liability under [Chapter 93A], when a breach of warranty is alleged to be an unfair or deceptive act, must be resolved by reference to general principles of liability under § 11 [of Chapter 93A], which are discussed in [Massachusetts case law]." Knapp Shoes, Inc., v. Sylvania Shoe Mfg. Corp., 640 N.E.2d 1101, 1106 (Mass. 1994).

19

The district court concluded that Saint-Gobain had not violated Chapter 93A, notwithstanding the jury's breach of warranty determination. The district court acknowledged that Massachusetts courts have found inducement to purchase goods of "dubious reliability for the intended purpose" a violation of Chapter 93A, VMark, 642 N.E.2d at 597, and "[d]elivery of a defective product without revealing the defects, to the extent they are known and material" also a violation of Chapter 93A, id. at 596-97. The district court, however, rejected Wellons' contention that Saint-Gobain had induced it to purchase ceramic tubes by offering an express warranty while knowing that the tubes were of dubious reliability or unfit for their intended purpose. The court also concluded that Wellons had failed to show that, at the time of delivery, Saint-Gobain knew or should have known of a problem that would likely cause the tubes to fail or that the tubes were of dubious reliability. Cf. W.S. Cummings Realty Trust v. HPG Int'l Inc., __ F.3d __, No. 00-1842, 2001 WL 274656, at *9 (1st Cir. Mar. 22, 2001). In part, these conclusions were based on the district court's assessment of the credibility of the witnesses.

Wellons now argues that Saint-Gobain twice violated Chapter 93A: first, by inducing Wellons to buy a product about which Saint-Gobain had grave doubts by concealing those doubts and by giving a performance warranty; and second, by repudiating the limited relief it had promised to give if and when the product failed, instead "stringing

20

Wellons along" until Wellons' customer demanded removal of all ceramic tubes, requiring Wellons to incur the cost of replacement and forcing Wellons into court for any recovery. Wellons' main argument is that even if the district court was correct in all of its factual findings,[7] those findings compel a conclusion that Saint-Gobain violated Chapter 93A.

## 1. Concealment of Doubts about Refired ADVANCER

Wellons argues that the Massachusetts Appeals Court's decision in VMark, supra, requires, based on the existence of ten elements, a finding of Chapter 93A liability here. We have carefully reviewed these arguments and reject them. This case is factually distinguishable from VMark. There, VMark had, inter alia, failed to mention past problems with the software it was licensing to EMC when that software was used with the particular hardware contemplated by EMC. See 642 N.E.2d at 592. VMark never explicitly communicated to EMC any of these problems; it instead assured EMC that "there would be no serious performance or conversion problems." Id. Moreover, VMark

---

[7] Wellons says two of the district court's findings are not supported by the evidence. We disagree. Those two findings relate to the amount of time Georgia-Pacific actually waited before opening the access doors to the ceramic tube bank section, whether that time was too short, and whether such conduct could have led to thermal shocking of the tubes. Even if wrong, the findings would not alter the outcome on the Chapter 93A claim since they relate primarily to the question of Saint Gobain's liability on the breach of warranty claim rather than to the allegations of deceptive or unfair conduct under Chapter 93A.

encouraged EMC to act quickly by offering EMC a twenty percent discount on the license fee if it signed the agreement before a certain date. Id.

Here, in contrast to VMark, Saint-Gobain never made glowing or unqualified recommendations about the ability of the tubes to perform in the prototype facilities. Uncertainties -- which Saint-Gobain raised at the outset -- were openly discussed and were well-known to Wellons and to Georgia-Pacific. Saint-Gobain told Wellons from the beginning that refired ADVANCER had not previously been used for heat exchangers, let alone the type anticipated at the Mt. Hope and Brookneal facilities. Cf. Underwood v. Risman, 605 N.E.2d 832, 835 (Mass. 1993) ("There is no [Chapter 93A] liability for failing to disclose what a person does not know."). Saint-Gobain also communicated its concern that ADVANCER was more porous than CRYSTAR. Saint Gobain's proposal to use CRYSTAR -- which it was more confident would perform without failure -- was rejected by Wellons for cost reasons. Saint-Gobain also wanted to perform additional tests on the tube materials, and, following discussions with Wellons and Georgia-Pacific representatives, performed those tests on sample tubes at an existing Georgia-Pacific plant in Skippers, Virginia. The test results were available to all.[8] That the tubes used at Mt. Hope and Brookneal

---

[8]     The first stage of those tests -- tests Saint-Gobain was told involved conditions that were not identical to but that were equivalent to or more severe than those expected at the Mt. Hope and

did not perform as promised in the warranty does not itself establish liability under Chapter 93A.

Wellons also stresses Saint-Gobain's refusal to acknowledge concerns raised by Dr. Semler about ADVANCER's ability to survive in a wood-combustion atmosphere containing alkali metals at the predicted temperatures, particularly after the tested tubes showed alkali metal deposits. Unfortunately, the district court did not make any findings on this issue. This court, viewing the record in the light most favorable to the ruling, see Arthur D. Little, 147 F.3d at 49 (internal quotation marks omitted), finds no attempt by Saint-Gobain to conceal information. At most, the record reflects that Saint-Gobain was overly optimistic in expecting that there would be no chemical-based problem with the tubes at Mt. Hope and Brookneal. That assessment may have been mistaken, thus exposing Saint-Gobain to liability for breach of warranty, but it is not one that establishes the requisite deceptive or unfair conduct to sustain a Chapter 93A violation.

2. Replacement of the Tubes Upon Failure

We also reject Wellons' argument that Saint-Gobain violated Chapter 93A by repudiating its promise to replace the tubes when they failed and instead "stringing Wellons along" until Georgia-Pacific demanded removal of all ceramic tubes. The facts amply support the

---

Brookneal facilities -- revealed no signs of tube deterioration upon removal of the tubes.

23

district court's contrary conclusion.  The record reflects the existence of a legitimate dispute about what caused the tubes to fail.  The jury's verdict that Saint-Gobain was responsible for their failure -- a verdict reached after weighing a great deal of technical evidence, including conflicting testimony from expert witnesses for each side -- neither establishes the absence of a legitimate dispute nor dictates an independent finding of Chapter 93A liability.  See Knapp, 640 N.E.2d at 1106; cf. Quaker State Oil Refining Corp. v. Garrity Oil Co., 884 F.2d 1510, 1513-14 (1st Cir. 1989) ("The mere fact that defendant did not prevail on its counterclaims is no signal that the counterclaims were groundless.").

This was not a case where the seller continued to withhold material information after the buyer was experiencing serious problems with the product it had purchased.  Cf. Cambridge Plating, 85 F.3d at 769-70.  Nor was this a case where one side continued to refuse to pay amounts due under a contract in order "to extract a favorable settlement . . . for less than the amount [it] knew that it owed by repeatedly promising to pay, not doing so, stringing out the process, and forcing [the other side] to sue." Cf. Arthur D. Little, 147 F.3d at 55-56; cf. also Commercial Union Ins., 217 F.3d at 43 (company's refusal to honor reinsurance contract, which reflected "lengthy pattern of foot-dragging and stringing [the other side] along, with the intent (as its own witnesses admitted) of pressuring [the other side] to

24

compromise its claim -- had the extortionate quality that marks a 93A violation").  In addition, Wellons never demanded that Saint-Gobain replace the tubes that failed, as Saint-Gobain was obligated to do under the warranty.[9]

Wellons also argues that Saint-Gobain's offer to sell a test batch of CRYSTAR at a discounted price was extortionate.  The district court made no finding as to this offer or its implications, and so again we view the record in the light most favorable to the ruling.  We conclude that Saint-Gobain's offer reflected an attempt to reach some agreement in light of the situation and of Saint-Gobain's rights under the contract.  That is not extortion.[10]

**IV.**

We vacate the district court's decision to award prejudgment interest to Wellons as of December 31, 1995, and remand for entry of an amended judgment awarding Wellons prejudgment interest as of December 8, 1997, and affirm the district court's dismissal of Wellons' Chapter 93A claim.

---

[9]    In fact, Saint-Gobain maintains that it was in the process of manufacturing replacement tubes to fill a request by Georgia-Pacific to replace failed tubes, but that the order was cancelled before it was complete, and that thereafter Wellons told Saint-Gobain that no solution involving replacement ceramic tubes -- whether CRYSTAR or ADVANCER -- would be accepted.

[10]    We do not reach Saint-Gobain's contention that its conduct did not occur "primarily" and "substantially" in Massachusetts as is required to establish Chapter 93A liability.  Mass. Gen. Laws ch. 93A, § 11; see Arthur D. Little, 147 F.3d at 52.

So ordered.