**ARTHUR D. LITTLE, INC., Arthur D. Little International, Inc., Plaintiffs, Appellees,**

v.

**DOOYANG CORPORATION, Dooyang America, Inc., Dooyang International, Inc., Defendants, Appellants.**

No. 98–1010.

United States Court of Appeals, First Circuit.

Heard May 4, 1998.

Decided June 25, 1998.

---

Before TORRUELLA, Chief Judge, SELYA and LYNCH, Circuit Judges.

LYNCH, Circuit Judge.

This case demonstrates the high costs Massachusetts imposes on businesses which engage in unfair or deceptive trade practices prohibited by Mass. Gen. Laws ch. 93A. The legal question raised here, one of first impression for this court, is whether when one business engages in unfair and deceptive practices towards another and the harm consists of a delay in payments owed (and the usual accompanying expenses), that is a "loss of money or property" establishing a violation under Mass. Gen. Laws ch. 93A, § 11. The high costs imposed are that the damages awarded are not those attributed solely to the nonpayment but rather may be multiples of the amount of payments originally owed.

Guided by the decisions of the courts of Massachusetts, as we must be in this diversity case, we answer this question in the affirmative and affirm the judgment of the district court. We resolve the "loss of money or property" issue and the other issues against appellants Dooyang.[1] For Dooyang's failure to pay invoices totaling $460,000, the jury and court awarded Arthur D. Little[2] $920,-000 in damages, plus interest, plus over a million dollars in attorney's fees and costs.

## I.

 Two large international companies, each unhappy with its dealings with the other, and each with some justification for that unhappiness, are involved in this litigation. We review the facts[3] "as the jury and district court could have found them." *Cambridge Plating Co. v. Napco, Inc.*, 85 F.3d 752, 756 (1st Cir.1996). "Where specific findings are lacking, we view the record in the light most favorable to the ruling, making all reasonably supported inferences." *Roche v. Royal Bank of Canada*, 109 F.3d 820, 821

Robert L. Weigel, with whom Gibson, Dunn & Crutcher, John A. Donovan, Jr., and Burns & Levinson were on brief, for appellants.

Peter J. Macdonald, with whom Charles P. Kindregan and Hale & Dorr were on brief, for appellees.

1. Appellants Dooyang Corporation, Dooyang America, Inc., and Dooyang International, Inc., will be collectively referred to as "Dooyang."

2. Appellees Arthur D. Little, Inc. and Arthur D. Little International, Inc. will be collectively referred to as "Arthur D. Little" or "ADL."

3. A more detailed description of the facts is set forth in the district court decisions. *See Arthur D. Little Int'l, Inc. v. Dooyang Corp.*, 995 F.Supp. 217, 219–21 (D.Mass.1998) ("*ADL III*"); *Arthur D. Little Int'l, Inc. v. Dooyang Corp.*, 979 F.Supp. 919, 921–24 (D.Mass.1997) ("*ADL II*"); *Arthur D. Little Int'l, Inc. v. Dooyang Corp.*, 928 F.Supp. 1189, 1192–1200 (D.Mass.1996) ("*ADL I*").

(1st Cir.1997) (citation and internal quotation marks omitted).

ADL is an international consulting firm with its home office in Cambridge, Massachusetts. ADL has an office in Caracas, Venezuela. Dooyang is an industrial conglomerate with headquarters in Seoul, South Korea. Dooyang hired ADL from 1988 to 1991 to assist it in a conceptualized aluminum smelter project. Though projects in other countries were initially considered, Dooyang soon instructed ADL to focus on opportunities for building a new smelter in Venezuela.

At the outset, ADL informed Dooyang that it also worked for the Corporacion Venezolana de Guayana ("CVG"), an arm of the Venezuelan government responsible for awarding valuable "debt-equity swap" subsidies, and for the Venezuelan minister responsible for energy and metal production. ADL was assisting CVG to attract investment in Venezuela. Acquisition of the debt-equity swap subsidies awarded by CVG was thought to be the key to the success of a smelter project in Venezuela. Dooyang consented to this conflict, apparently believing that ADL's insider influence would redound to Dooyang's benefit. In March of 1989, ADL recommended that Dooyang invest in the construction of a new smelter rather than join an existing project.

Soon after, and wearing its other hat, ADL met with CVG to assist it in attracting international investment in the Venezuelan aluminum industry, and contracted with CVG to evaluate the relative merits of various aluminum smelter proposals. Obviously, one of the proposals ADL could end up evaluating was that of its other client, Dooyang.

In June of 1989, ADL and Dooyang entered into the first in a series of agreements under which ADL would assist Dooyang in developing a new smelter. ADL pledged to use its "best efforts" to assist Dooyang in a wide variety of areas, including assembling the necessary financing and technical support, and lobbying the Venezuelan government on Dooyang's behalf. ADL evaluated and selected advisers and partners in the project. At no time, however, was ADL empowered to enter into contracts or make other commitments on Dooyang's behalf.

In its other capacity, ADL advised CVG in July of 1989 to seek an investor which had the capacity to develop a smelter without partners. ADL advised CVG to focus on projects by ALCOA and ALUMAX, and to consider as a third possibility either Cisneros/Rich or Austria Metall. Dooyang could not develop a smelter by itself, but had to enter into partnerships with other companies. At this point, however, Dooyang had not decided to go forward with a project in Venezuela, and so had no proposal then for consideration. But that changed: in January of 1990, Dooyang and CVG entered into an agreement which stated Dooyang's intent to build a smelter in Venezuela.

The contract between ADL and Dooyang was to expire by its terms at the end of 1989. ADL and Dooyang agreed to extend the contract for an additional six months in January of 1990. During 1990, ADL also represented CVG in negotiations with other potential investors such as ALCOA. Dooyang was aware that ADL's work for CVG involved contacting other competing investors. ADL and Dooyang agreed to a third six-month extension of the contract in July of 1990.

In April of 1990, ADL compared for CVG the relative merits of three smelter project proposals by ALCOA, Dooyang, and ALUMAX. ADL stressed that ALCOA was the only company capable of proceeding with a smelter on its own. ADL recommended that CVG "be more aggressive" with ALUMAX in order to keep its interest. With regard to Dooyang, ADL said that Dooyang was "serious about the project" and that they were "spending major funds to advance their position," and that ADL was "confident that they will continue to move very rapidly." ADL later reiterated to CVG that because ALCOA had all of the needed elements "in house," great effort should be expended to realize the ALCOA project. In a July 1990 report, ADL identified the ALCOA and ALUMAX projects as the "focus" projects, and stated that Dooyang was "one of the leading projects."

Dooyang was aware that ADL was evaluating competing projects for CVG. ADL provided Dooyang with partial copies of its pre-

sentations to CVG, and assured Dooyang that ADL had convinced CVG "that the Dooyang project is the number one project to support." Dooyang submitted its project proposal and bid for subsidies from the Venezuelan government in December of 1990.[4] Dooyang and its equity partners proposed building a smelter on the Orinoco river, dubbed the "Orinoco project." CVG rejected Dooyang's Orinoco project application in March of 1991 in favor of the ALCOA project.

Dooyang met with ADL in Caracas to discuss resubmitting the proposal. In early 1991, ADL and Dooyang again extended the letter agreement. At least by April 20, 1991, as the district judge subsequently found, Dooyang decided not to pay ADL. Dooyang felt that ADL should do the work on the second subsidy application for free because Dooyang had spent millions on this project with no result.[5] Dooyang did not inform ADL that it expected ADL to continue working for no compensation, and Dooyang continued to request ADL's services after it had decided not to pay for them.

The Dooyang Orinoco project proposal was resubmitted on April 26, 1991. In June, the Venezuelan government approved the project, and in July it awarded subsidy rights to Dooyang as well as to a third company. Dooyang thanked ADL for its assistance, and did not further extend its contract with ADL. The smelter was never built. Dooyang's major partners pulled out of the project, and the collapse of the Soviet Union triggered a plunge in aluminum prices which rendered the project economically infeasible then. Dooyang had incurred over $9 million in costs connected to the Orinoco project. ADL had been paid over $2.2 million for its work.

ADL had worked from March through June of 1991, and billed Dooyang approximately $460,000 for these services. It is the invoices for this work which were not paid and became the subject of a breach of contract claim. It is how Dooyang behaved in not paying the bills which became the basis for the unfair and deceptive trade practices claim.

Dooyang repeatedly promised to pay the outstanding ADL invoices, though it had no intent to do so. Dooyang falsely blamed the hold-up in payment on bureaucratic delays and supposed problems with currency regulations. After ADL inquired about the unpaid invoices, Dooyang provided ADL with a letter stating that Dooyang was "sorry for your inconvenience caused by the delay of payment, and ... appreciate[d] ... your kind understanding of the time consuming procedure." The letter stated that the outstanding balance would be settled by the end of October 1991 at the latest.

In late October 1991, ADL again insisted on payment and Dooyang replied that the invoices would be settled by "December 1991/January 1992." In a November 1991 meeting in ADL's Cambridge offices, Dooyang agreed to pay the outstanding invoices by January 1, 1992. Dooyang missed that deadline, and ADL again made repeated inquiries about payment.

Finally, Dooyang sent a letter to ADL's Cambridge office in March of 1992 stating that Dooyang had "no intention to delay or discard the payment" and promised to pay starting in January of 1993. The letter assured ADL that "[a]ll outstanding payment will be cleared up no later than June 30, 1993 at the latest." Dooyang missed that deadline, and an ADL executive contacted the President of Dooyang directly, who professed

---

4. In a November 1989 presentation to Dooyang, ADL had said that CVG would provide port facilities and the project site. In March of 1990, however, ADL warned Dooyang that inadequate port facilities was a primary infrastructure problem. A week later, ADL informed CVG that port facilities were inadequate, and in April ADL told CVG that CVG was not in a position to provide adequate infrastructure and recommended that CVG make the projects responsible for providing port facilities. ADL then apparently convinced Dooyang to provide the port.

5. A senior Dooyang executive, who was also Dooyang's Rule 30(b)(6) designee, testified that, after Dooyang's project was not approved the first time it was submitted, "for the second time, I thought that ... ADL should work for Dooyang to get the second debt/equity swap licensing procedure for free." Dooyang did not object to the court's instruction to the jury that this executive's testimony was to be considered "fully as a statement by Dooyang, because [he] was acting on Dooyang's behalf."

to be unaware of the problem. Dooyang again promised to pay ADL by June of 1993. Once again, Dooyang missed the deadline.

Even while Dooyang was falsely promising to pay ADL and its other creditors, it continued to exploit the benefits of their unpaid work. Dooyang continued to pursue the smelter project, and as late as August of 1994, Dooyang was dealing directly with CVG and expressing "keen interest" in pursuing the project. It still did not pay ADL.

Dooyang's dissembling was part of its deliberate strategy on the Orinoco project. Dooyang's strategy was to force its creditors to accept deeply discounted payments by forcing them to litigate to collect on their bills. This was not a matter of inference. Dooyang said as much in its business documents. In its internal 1992 Business Report, Dooyang stated that it had been "delaying accounts payable associated with the Orinoco project by all possible means." The Business Report included a chart listing each of Dooyang's advisors on the Orinoco project, followed by a column titled "ACCOUNT PAYABLE" listing the amounts Dooyang owed them, and another, blank column titled "Settlement" for listing the amounts to which Dooyang was able to reduce the fee through its delaying tactics. Other advisors on the project also had to resort to litigation to recover their unpaid fees after receiving similar empty promises about the payment of outstanding bills. Not one of Dooyang's five largest creditors was paid anything without first resorting to litigation.

The district court found that Dooyang made repeated written intentional representations to ADL concerning its intent to pay the invoices, and found that from at least April 20, 1991, Dooyang had no intent to pay ADL. The district court found that, once the project began to founder, "Dooyang abandoned any intent to pay any consultants, including ADL, made false representations about intent to pay, never had any good faith basis for delaying payment, and intended to force ADL to litigate as leverage to force a favorable settlement." *ADL II*, 979 F.Supp. at 924.

## II.

ADL sued Dooyang in Massachusetts state court in August 1994 on theories of breach of contract, fraud, and unfair and deceptive trade practices in violation of Chapter 93A. Dooyang removed the case to federal court in September 1994. Dooyang counterclaimed, arguing that it did not have to pay ADL. Dooyang alleged that ADL fraudulently induced it to enter into the consulting agreements and made continuous fraudulent and negligent misrepresentations, that ADL failed to provide Dooyang with "accurate and complete information" about the smelter project in Venezuela, that ADL breached its contract because it failed to use its "best efforts," and that ADL violated Chapter 93A through unfair or deceptive business practices. Dooyang's counterclaims were based on ADL's work for the Venezuelan government and Dooyang's perception that ADL was duplicitous.

The district court granted ADL's motion for summary judgment on Dooyang's Chapter 93A claim. ADL voluntarily dismissed its fraud claims on the eve of trial. After a jury trial on the remaining claims and counterclaims, except ADL's Chapter 93A claim, the jury found, after two days of deliberation, in favor of ADL on its breach of contract claim and awarded it $460,000 in damages (the full amount of its bills for services rendered from March to June 1991).

As to the Chapter 93A claim (triable to the court under Massachusetts law), the district court concluded that ADL had proved that Dooyang engaged in "unfair or deceptive acts or practices." These acts or practices were: Dooyang's ordering consulting services without intending to pay for them, Dooyang's expressing intent to pay ADL when it had no intent to do so, and Dooyang's strategy of "commercial extortion" by which it attempted to force favorable price concessions through the threat of litigation. *See ADL II*, 979 F.Supp. at 925. Under Chapter 93A, the unfair or deceptive conduct must "occur primarily and substantially within Massachusetts" to be actionable. The court ruled that only Dooyang's conduct in misleading ADL about paying its bills was a 93A violation, because this conduct occurred in Massachu-

setts. *See id.*[6] Because the violation was willful, the court doubled ADL's damages to $920,000 plus statutory interest. *See id.* at 927–28.

### III.

Dooyang raises two issues on this appeal. Dooyang first contends that the special verdict form improperly precluded consideration of Dooyang's counterclaims. Second, Dooyang argues that the district court misapplied the law in holding that Dooyang's false promises to pay ADL constituted a Chapter 93A violation.

*A. The Special Verdict Form*

■ Dooyang argues that the district court improperly precluded consideration of its counterclaims by instructing the jury to consider Dooyang's counterclaims only if it found that ADL had failed to prove that Dooyang "materially breached its contract to pay for services provided by ADL *without legal excuse*" (emphasis added).[7] According to Dooyang, the district court improperly collapsed the whole of Dooyang's counterclaims into the phrase "without legal excuse."

■ The parties dispute whether Dooyang properly objected to the verdict form. Where there has been a proper objection to a claimed error in a special verdict form, our review is for an abuse of discretion. *See*

Transamerica Premier Ins. Co. v. Ober, 107 F.3d 925, 933 (1st Cir.1997). But where there is no objection, our review is for plain error only. *See Cambridge Plating Co.*, 85 F.3d at 767. Because even under the less deferential abuse of discretion standard there was no error, we do not decide whether Dooyang's somewhat vague objection was adequate to preserve the claim.

■ Under the abuse of discretion standard, we examine the jury instructions as a whole to determine whether they confused or misled the jury on the applicable law. *See Tatro v. Kervin*, 41 F.3d 9, 14 (1st Cir.1994). We assume the jury listens to and follows the judge's entire charge. *See United States v. Gonzalez–Gonzalez*, 136 F.3d 6, 9 (1st Cir. 1998). Nonconstitutional errors in a civil suit are harmless if it is probable that the error did not affect the outcome of the case. *See Moulton v. Rival Co.*, 116 F.3d 22, 26 (1st Cir.1997); *see also Putnam Resources v. Pateman*, 958 F.2d 448, 456 (1st Cir.1992) ("[A] district court has wide discretion in constructing and utilizing verdict forms." (citations omitted)).

The district court's jury instructions made clear the burden ADL had to meet to prove that Dooyang breached the contract "without legal excuse." The court instructed the jury at length that ADL had to prove the elements of its breach of contract claim.[8] In addition, the court made it clear that it was

---

6. The earlier conduct, the ordering of consulting services without intending to pay for them, did not take place primarily and substantially in Massachusetts and so did not become the basis for the 93A determination. There is no appeal from this ruling or from the district court's segmenting of the commercial activities into components for Chapter 93A analysis and so we do not comment on those issues. We only note that we agree with the district court's conclusion that the "second act of deception" occurred in Massachusetts. *See ADL II*, 979 F.Supp. at 926.

7. The first question on the special verdict form was: "Did Plaintiff Arthur D. Little ('ADL') prove that Dooyang Corporation ('Dooyang') materially breached its contract to pay for services provided by ADL without legal excuse?" If the jury answered "yes," it was directed to decide whether this breach of contract proximately caused ADL's damages, and to decide how much money would compensate ADL for its damages, and then to go to the end of the verdict form. If the jury answered "no," it was directed to a series of questions concerning Dooyang's counterclaims.

8. The court instructed the jury:

ADL must prove that it performed its obligations under the contract and did not breach the contract in a material way. . . .

In order to prevail on its breach of contract claim, ADL must prove that it performed its obligations under the contract to provide Dooyang with its best efforts and best judgment. . . .

In order to prevail on its breach of contract claim, ADL must also prove that it complied with its duty of good faith and fair dealing. . . . [I]f ADL committed any intentional or reckless misrepresentations or omissions to Dooyang . . . this would be a breach of [its] duty of good faith and fair dealing that would also constitute a legal excuse for Dooyang's failure to pay.

If ADL did not disclose any material information to Dooyang, you may consider that nondisclosure in determining whether there is a breach of contract or a breach of the duty of good faith and fair dealing. . . .

ADL must prove that Dooyang failed to perform an essential element of its expressed con-

ADL's burden to show that Dooyang did not have any "legal excuse" for its non-payment.[9]

In fact, Dooyang was the beneficiary of this instruction. The effect of the "without legal excuse" language was to shift the burden of proof on Dooyang's claims from Dooyang to ADL. ADL was required to disprove Dooyang's counterclaims to prevail on its breach of contract claim. Because Dooyang presented its counterclaims as defenses to ADL's breach of contract claim, it was relieved of the burden of proving its assertions. *See ADL I*, 928 F.Supp. at 1205. Instead, ADL had the burden to prove that Dooyang's failure to pay the 1991 bills was "without legal excuse." The instructions on "legal excuse" make it clear that Dooyang did not have to pay ADL if Dooyang's counterclaims had merit.

Because the case involved a single contract, the jury could not have found both in ADL's and Dooyang's favor.[10] Because the jury found in ADL's favor, it necessarily rejected Dooyang's counterclaims. There was no abuse of discretion in the format of the verdict form.

## B. The Chapter 93A Violation

 Dooyang's second claim of error is that the district court misapplied the law of Chapter 93A. Dooyang's argument has two components: first, that its actions were not "unfair or deceptive," and second, that those actions did not, in any event, cause a "loss of money or property." We review the district court's findings of fact for clear error and its conclusions of law de novo. *See Cambridge Plating Co.*, 85 F.3d at 769. "Although whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact, the boundaries of what may qualify for consideration as a [Chapter] 93A violation is a question of law." *Ahern v. Scholz*, 85 F.3d 774, 797 (1st Cir.1996) (citation and internal quotation marks omitted).

Our review is of the district court's finding that the "second act of deception," Dooyang's continual promises to pay ADL when it had no intent to do so as part of a strategy to force its creditors to accept discounted settlements, constituted a violation of Chapter 93A. Under Chapter 93A, the act or practice must be "unfair or deceptive," must occur "primarily and substantially" in Massachusetts, and must cause a loss of "money or property." Based on our review of the evidence, we find that the district court's findings of fact are not clearly erroneous and we will not disturb them. We agree with the

---

tractual promise or filed to comply with its own duty to deal in good faith and fair dealing with ADL, without legal excuse.

**9.** With regard to "legal excuse," the district court further instructed the jury:

> [B]efore you can find that Dooyang breached the contract, you must find that it did not have a legal excuse for its nonpayment.

> Dooyang contends that it was excused from paying by ADL's breach of its own obligations. Failure on the part of ADL to perform any of [its] material obligations under the contract or any intentional misrepresentations or omissions by ADL that are material would constitute such an excuse. Thus, if you find that ADL committed a material breach of the agreement according to the instructions I have just given you, then [Dooyang] is legally excused from making its payment to ADL.

> It is well established that a material breach by one party excuses the other party from further performance under the contract. Thus, if ADL did not perform [its] own obligations under the contract, then it cannot recover for Dooyang's breach because ADL's voluntary failure to complete its own agreement prevents recovery.

**10.** This case involves a single contract that was repeatedly extended by the parties. The district court instructed the jury, without objection, that "the parties do not dispute that they entered into a six-month contract in June of 1989, which was extended twice, through to the end of 1990, in which Dooyang promised to pay for services rendered by ADL. The parties further agree that they entered into a modified extension of this basic agreement ... for the months, of March, April and May of 1991." Dooyang now attempts to characterize the final extension as a separate "Spring 1991 contract," but this novel argument is unavailing. *See Windsor Mount Joy Mut. Ins. Co. v. Giragosian*, 57 F.3d 50, 56 n. 7 (1st Cir. 1995) (arguments not properly raised below are waived on appeal); *La Amiga del Pueblo, Inc. v. Robles*, 937 F.2d 689, 690–91 (1st Cir.1991) (unobjected-to jury instructions become law of the case). Nor was there cause for objection, as this instruction was amply supported by the evidence, such as a letter dated January 15, 1991, from Dooyang to ADL, discussing "an extension of [ADL's] service contract."

district court that Dooyang's "second act of deception" qualifies as a Chapter 93A violation.

### 1. Unfair or Deceptive

 Under §§ 2 and 11 of Chapter 93A, it is unlawful for those engaged in trade or commerce to employ "unfair methods of competition and unfair or deceptive acts or practices" in business transactions with others engaged in trade or commerce. Chapter 93A "was designed to encourage more equitable behavior in the marketplace and impose liability on persons seeking to profit from unfair practices." *Linkage Corp. v. Trustees of Boston Univ.*, 425 Mass. 1, 679 N.E.2d 191, 208 (1997) (citation, internal quotation marks and alterations omitted). The statute does not specifically define "unfair" or "deceptive." *See Ahern*, 85 F.3d at 798 ("[T]he statute does not contemplate an overly precise standard of ethical or moral behavior. It is the standard of the commercial marketplace." (citation and internal quotation marks omitted)); *Linkage Corp.*, 679 N.E.2d at 209 ("A practice is unfair if it is within the penumbra of some common-law, statutory, or other established concept of unfairness; is immoral, unethical, oppressive, or unscrupulous; and causes substantial injury to other businessmen." (citation, internal quotation marks and alterations omitted)).

The courts of Massachusetts have consistently held that "conduct in disregard of known contractual arrangements and intended to secure benefits for the breaching party constitutes an unfair act or practice for c. 93A purposes." *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 583 N.E.2d 806, 821 (1991) (citation and internal quotation marks omitted). *See Pepsi–Cola Metro. Bottling Co. v. Checkers, Inc.*, 754 F.2d 10, 17–19 (1st Cir.1985) (Chapter 93A violation found where payment withheld as a "wedge" to enhance bargaining power); *Wang Labs., Inc. v. Business Incentives, Inc.*, 398 Mass. 854, 501 N.E.2d 1163 (1986). Where one party to an agreement employs a breach of contract to gain an unfair advantage over the other, the breach "has an extortionate quality that gives it the rancid flavor of unfairness." *Atkinson v. Rosenthal*, 33 Mass.App.Ct. 219,

598 N.E.2d 666, 670 (1992) (citation omitted). Indeed, conduct largely equivalent to Dooyang's second act of deception has recently been held to violate Chapter 93A. *See Community Builders, Inc. v. Indian Motocycle Assocs., Inc.*, 44 Mass.App.Ct. 537, 692 N.E.2d 964, 978 (1998) (defendants "withheld payment unconscionably, stringing [plaintiff] along ... with a purpose of coercing [plaintiff] to settle for substantially less compensation than the parties had agreed to before the services were performed").

The district court's factual finding of unfair practices is clearly supported by the evidence. The court based its Chapter 93A ruling both on testimony that Dooyang did not intend to pay ADL for the work it performed and on documents which stated that Dooyang was avoiding paying its creditors "by all possible means" and which created a mechanism for measuring the success of its strategy by listing the reductions that resulted from Dooyang's deceptive tactics. As the district court found, Dooyang intended to force ADL into an unfavorable settlement by threatening litigation. There was no error in the court's finding that the "second act of deception" amounted to an "unfair or deceptive act or practice" under Chapter 93A.

 Chapter 93A liability is decided case-by-case, and Massachusetts courts have consistently emphasized the "fact-specific nature of the inquiry." *Linkage Corp.*, 679 N.E.2d at 209. We emphasize that this case did not involve a good faith dispute over billing or a simple breach of contract, each of which is an insufficient basis for 93A liability. *See, e.g., Pepsi–Cola Metro. Bottling Co.*, 754 F.2d at 18 (stating that "mere breaches of contract, without more, do not violate [C]hapter 93A"); *Whitinsville Plaza, Inc. v. Kotseas*, 378 Mass. 85, 390 N.E.2d 243, 251 (1979). This case is not like *Quaker State Oil Refining Corp. v. Garrity Oil Co.*, 884 F.2d 1510, 1513–14 (1st Cir.1989), which held that refusal to pay an invoice without "more" was not enough to constitute a 93A violation. Here, Dooyang's wrongful purpose was to extract a favorable settlement from ADL for less than the amount Dooyang knew that it owed by repeatedly promising to pay, not doing so,

stringing out the process, and forcing ADL to sue.

These developments in Massachusetts law will require the Massachusetts courts to give greater definition and clarity to the parameters of § 11 liability for those who do business in Massachusetts. Mere failure to pay a bill, standing alone, does not, it appears, give rise to such liability. *See id.* Where there is a good faith dispute over whether payment is actually owed, and that dispute is clearly articulated, it also appears there is no Chapter 93A liability. *See id.; Levings v. Forbes & Wallace, Inc.,* 8 Mass.App.Ct. 498, 396 N.E.2d 149, 153 (1979). Of course, due to the fact-specific nature of the Chapter 93A inquiry, generalizations are always somewhat indeterminate. *See Cambridge Plating Co.,* 85 F.3d at 769 ("Perhaps by design, the dimensions of Chapter 93A liability are difficult to discern with precision."). This case does not involve a mere failure to pay a bill, and the facts are sufficiently strong that we easily conclude they are actionable as "unfair or deceptive" under Chapter 93A. We leave to the development of state law where the lines will be drawn in these "the check is in the mail" type cases.

### 2. Loss of Money or Property

 ADL had the burden of showing not only that the acts were unfair or deceptive, but also that it suffered a "loss of money or property" under Mass. Gen. Laws ch. 93A, § 11. " '[M]oney' means money, not time, and ... 'property' means the kind of property that is purchased or leased, not such intangibles as a right to a sense of security, to peace of mind, or to personal liberty." *Baldassari v. Public Fin. Trust,* 369 Mass. 33, 337 N.E.2d 701, 709 (1975). And that loss of money or property must stem from Dooyang's misrepresentations regarding payment. *See Lyle Richards Int'l, Ltd. v. Ashworth,* 132 F.3d 111, 114–15 (1st Cir.1997) (loss of money or property required under § 11 must stem from deceptive act). It is the misrepresentations about payment which must have caused the loss because those misrepresentations, not the formation of the contract extension itself, took place in Massachusetts and so are subject to Chapter

93A. "[W]hether the requisite causal connection has been proven is one of fact" that will not be set aside unless clearly erroneous. *DiMarzo v. American Mut. Ins. Co.,* 389 Mass. 85, 449 N.E.2d 1189, 1199 (1983) (citation omitted).

This requirement is satisfied by the combination of ADL's loss of the use of the money owed by Dooyang together with ADL's expenses incurred attempting to collect Dooyang's debt. While we have found no § 11 cases directly on point, a number of cases under § 9 are helpful in the analysis. The closest § 11 case is *Community Builders,* in which false promises to pay and delay caused a loss of use of money, attendant expenses, and caused plaintiff to continue to do work. Here plaintiff did not continue to do work and so the Appeals Court did not face the precise issue that we face.

Massachusetts courts have held in § 9 cases against insurers under Chapter 93A and Mass. Gen. Laws ch. 176D that the loss of the use of money owed to a plaintiff, once liability is "reasonably clear," is a form of damage compensable by Chapter 93A. *See Clegg v. Butler,* 424 Mass. 413, 676 N.E.2d 1134, 1139 (1997) (stating that "when an insurer wrongfully withholds funds from a claimant, it is depriving the claimant of the use of those funds" and so constitutes injury cognizable under Chapter 93A though the insurer eventually pays). *Clegg* reiterated the rule announced in *Schwartz v. Rose,* 418 Mass. 41, 634 N.E.2d 105, 109 (1994), that the loss of the use of money "is precisely the type of damage we have described as appropriately being subject to multiplication ... under c. 93A." *Schwartz* was not a claim against an insurer under Chapter 176D, and so we take it that the *Schwartz* rule has general application, at least under § 9.

In 1979 the Massachusetts legislature amended Chapter 93A to eliminate the requirement of pleading a loss of money or property under § 9. *See Smith v. Caggiano,* 12 Mass.App.Ct. 41, 421 N.E.2d 473, 475 (1981). Now, under § 9, a plaintiff must prove that he or she has "been injured" by the defendant's unfair or deceptive practices. Mass Gen. Laws. ch. 93A, § 9. One question is whether the cases under § 9, which re-

quires only a showing that plaintiff has "been injured," provide guidance on what is meant by "loss of money or property" under § 11. The two phrases are not coextensive. "Injury" is a broader term, and includes, for example, emotional distress. *See Leardi v. Brown,* 394 Mass. 151, 474 N.E.2d 1094, 1101 (1985) (interpreting "injury" under § 9 to include "an invasion of a legally protected interest, but no harm for which actual damages can be awarded"). But loss of money or property is certainly one form of injury.

We think the § 9 cases provide guidance. In these § 9 cases, the court rejected arguments that the plaintiff suffered no injury because he suffered only a delay in payment rather than an absolute loss. Certainly, the loss of use of money, along with attendant collection and other expenses would seem to be both an "injury" under § 9 and a "loss of money or property" under § 11. *Cf. Caggiano,* 421 N.E.2d at 476 (" 'Money' means ... 'money,' but its loss may occur short of physical transfer of legal tender.").

In addition to the loss of the use of the money, Dooyang's unfair withholding of payment caused ADL to make expenditures to recover the money owed: long-distance phone calls and faxes to South Korea, and meetings with Dooyang executives. Such expenditures have been found to satisfy the "loss of money or property" requirement. *See Alcan Aluminum Corp. v. Carlton Aluminum of New England,* 35 Mass.App.Ct. 161, 617 N.E.2d 1005, 1013 (1993) ("Carlton did suffer an actual loss of money or property—by responding to customer complaints and lawsuits about the defective siding...."); *Bump v. Robbins,* 24 Mass.App.Ct. 296, 509 N.E.2d 12, 22 (1987) ("There is evidence of out-of-pocket expenditures for travel and long-distance telephone calls, time spent at meetings and in other related activities, and the usual charges Bump made for his time."); *see also Baldassari,* 337 N.E.2d at 709 (when plaintiffs suffered only emotional distress, no loss of money or property, but a different question would have been presented had plaintiffs suffered expenses).[11] This combi-

nation of expenses and loss of use of money meant that ADL suffered a "loss of money or property" caused by Dooyang's second act of deception.

A question remains about the proper measure of damages in this case. The district court doubled the breach of contract damages, but also ruled that Dooyang's initial act of deception was not covered by Chapter 93A. This theoretically could raise the issue of whether damages should be limited to only those damages caused by the second act of deception or whether § 11 precludes such a measure of damages. Dooyang does not argue in its brief that the court's doubling of the entire amount of the underlying contract damages was error, but maintains only that there was no loss of money or property caused by the second deceptive act as required by § 11. Dooyang's brief perfunctorily challenges the district court's decision to award *double* damages, but does not address the proper amount to be doubled. Dooyang has thus conceded the issue of the amount to be doubled, and we do not reach the theoretical issue. *See King v. Town of Hanover,* 116 F.3d 965, 970 (1st Cir.1997) (claims not argued on appeal are deemed waived).

■■■ The district court awarded ADL double damages on the ground that Dooyang's misconduct was "willful and knowing." The district court clearly articulated its reasons for levying multiple damages, and we agree. *See ADL II,* 979 F.Supp. at 926–28. For the reasons stated in the opinion of the district court, we do not find the award of double damages based on Dooyang's willful deceptive acts to be excessive in this case.

The judgment of the district court is *affirmed.* Costs are awarded to ADL.

---

11. Similarly, *NASCO, Inc. v. Public Storage, Inc.,* 127 F.3d 148 (1st Cir.1997), held that under § 11 a party that incurred bills that were never paid suffered adverse effects sufficient to trigger liability for attorney's fees under Chapter 93A. *See id.* at 154 ("[T]hat a valid debt ... has not been paid does not mean that there has been no adverse effect.").