Connolly, Thomas E., J.

INTRODUCTION

This civil action came on for a jury trial on August 29, 2005 in Cambridge. After a six-day trial, the jury returned a special verdict which found that Investors Capital Holdings, LTD (“Investors Capital”) had breached the parties’ contract and awarded $410,000 to Physicians Insurance Agency of Massachusetts, Inc., (“PIAM”). The juiy found that PIAM did not breach the parties’ contract. PIAM now contends that Investors Capital knowingly and willfully committed unfair and deceptive acts in violation of G.L.c. 93A, and is therefore entitled to treble damages, attorneys fees, and costs.

FINDINGS OF FACT

PIAM is a wholly owned subsidiary of the Massachusetts Medical Society (“MMS”), which provides insurance and financial services to Massachusetts physicians. Investors Capital is a financial services holding company that operates primarily though its subsidiaries to provide financial products and investment services. In February 2002, PIAM issued a Request for Proposal (“RFP”) to identify and select a replacement vendor to operate PIAM Financial Services to service Massachusetts’ physicians, medical professionals, and others in the MMS community. IC presented a Financial Services Vendor Proposal and Marketing Plan to PIAM’s Board of Directors on May 13, 2002. In late May 2002, PIAM selected Investors Capital as its Financial Services Vendor. On October 3, 2002, PIAM and Investors Capital entered into a written contract with an effective date of June 1,2002.
The contract provided for a three-year term, with an expiration date of May 31, 2005, subject to earlier termination upon specific conditions. Among other terms, the contract also provided that Investors Capital would pay PIAM certain percentages of revenue but in no event, less than $150,000 for three years, with $8,000 payable each month towards that minimum; PIAM would provide Investors Capital with MMS membership information; PIAM would cooperate with Investors Capital marketing efforts; and Investors Capital would designate a group of agents as “PIAM Financial Service Agents.” Most importantly, the contract provided a “Limitation of Damages” provision providing that “In no event, shall either parly be liable to the other for any incidental, indirect, or consequential damages."
Both Investors Capital and PIAM promoted the contract. On and after June 1, 2002, Investors Capital hired and trained eleven financial agents exclusively dedicated to the PIAM program, and rented office space on the same campus dedicated to the PIAM program. Investors Capital also selected products to offer MMS members, designed marketing materials, obtained a trademark for the slogan, “Trust a Specialist,” and developed informational brochures to be distributed to MMS members. The President of the MMS sent out correspondence promoting the financial program on September 4, 2002 and again on January 21, 2003. PIAM also sent a letter to medical practice administrators promoting the program in October 2002. Further, PIAM developed marketing brochures, advertised in hospital newsletters, and promoted the program at a golf tournament. Despite these efforts, the year one revenue generated by the program did not exceed the minimum level of $150,000.
It was almost immediately apparent there were problems with the contract. Although Investors Capital made its initial November 2002 payment of $40,000 for the first five months of the contract, it did not make any further payments. In February 2003, Paul Auffermann, (“Auffermann”), then PIAM’s president, telephoned Timothy Murphy (“Murphy”), Investors Capital’s Chief Financial Officer, asking why payments had not been made. Murphy stated he assumed it had been taken care of and still intended to live up to the contract. Following this phone call, Auffermann sent Murphy an invoice for the $8,000 monthly flat fee for November 2003 though January 2003. Investors Capital did not pay that invoice.
On March 21, 2003, Auffermann, and Jack King (“King”), then PIAM’s vice President for Sales and Marketing, met with Investors Capital’s Chief Executive Officer, Ted Charles (“Charles") and other representatives of Investors Capital at Investors Capital’s *286 offices. Investors Capital expressed their anger at how the program had failed to progress and blamed PIAM for the program’s lack of success. Specifically, Investors Capital blamed PIAM for failing to produce prompt and complete access to its database and to make timely approvals of Investors Capital’s marketing and seminar proposals. Aufferman and King both stated that this was the first they heard about Investors Capital’s misgivings.
After this meeting, Investors Capital attempted to renegotiate the agreement. Specifically, beginning in March 2003, Dan Mastrototaro (“Mastrototaro”), who ran the financial program for Investors Capital, sent King and Auffermann a series of emails calling for the reduction of its minimum payment obligation for the 2002 fiscal year by 50%, to $75,000, and to renegotiate the 2003 and subsequent contract years as well. Investors Capital claimed that this reduction was warranted because the contract was not signed until October 2002; the database was not received until November 28,2002; and Investors Capital’s marketing efforts were put on hold until January 2003.
At a PIAM Board of Directors meeting on April 16, 2003, Auffermann told the board that PIAM wanted to accommodate Investors Capital’s request by bringing down the minimum guarantee by basing it on 2/3 of the year, since the contract had not been signed until October 2002, thereby changing the payment from $150,000 to $100,000. However, this sentiment was short-lived because in a meeting held between Auffermann and Mastrototaro on May 14, 2003, Auffermann reportedly told Mastrototaro that he considered Investors Capital to be holding the money owed to PIAM hostage. Further, on June 14, 2003 PIAM sent Investors Capital a letter demanding that Investors Capital pay the amounts due under the contract and stated that Investors Capital’s attempts to persuade PIAM to accept payment concessions while money was owed and the program was understaffed violated G.L.c. 93A.[1]
In response to this letter, Investors Capital sent a letter dated August 7,2003, to PIAM stating that it was terminating the contract because of PIAM’s material breaches of the contract. As the basis for its termination, Investors Capital alleged that PIAM had fraudulently induced it into entering the Contract by misrepresenting the number of Society members as being 24,000. Also, Investors Capital alleged that PIAM had not provided “acceptable” lists of members until February 2003. Further, PIAM failed to give timely approvals on marketing the financial service program to the point that Investors Capital could not begin soliciting Society members until January 2003. The letter also claimed that these acts constituted a violation of G.L.c. 93A. Despite the contract being terminated, Investors Capital still received a portion of the commission generated by sales made after August 7, 2003.
PIAM initiated the lawsuit on August 28, 2003 seeking $410,000, which was the minimum contract balance under its breach of contract claim, and up to treble damages plus counsel fees for unfair and deceptive trade practices on its G.L.c. 93A claim. Investors Capital asserted counterclaims for breach of contract and violation of G.L.c. 93A, seeking the $40,000 it paid PIAM, plus out of pocket costs. After a six-day trial beginning on August 29, 2005 in Cambridge, the jury returned a special verdict which found that Investors Capital had breached the parties’ contract and awarded $410,000 to PIAM.

RULINGS OF LAW I. 93A Waiver

In Massachusetts, G.L.c. 93A, §2(a) makes unlawful any unfair or deceptive acts or practices in the conduct of any trade or commerce. See Stop and Shop v. Loomer, 03-P-1643 (Mass.App.Ct. November 28, 2005). G.L.c. 93A, §11 makes this prohibition applicable to those engaged in trade or commerce in business transaction with others engaged in trade or commerce. Lily Transp. v. Royal Institutional Serv., 64 Mass.App.Ct. 179, 187 (2005). Recovery for violations of G.L. 93A, §11 “shall be in the amount of the actual damages; or up to three, but not less than two, times such amount,” as well as “reasonable attorneys fees and costs incurred in said action." Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc., 754 F.2d 10, 17 (1st Cir. 1985).
A commercial party to a contract waives its right to recover under G.L.c. 93A where the G.L.c. 93A claim is based on a breach of the contract and the contract contains a limitation of damages provision barring the recovery of indirect, special, incidental and consequential damages, so long as it does not frustrate public policy. See Canal Elec. Co. v. Westinghouse Elec. Co., 406 Mass. 369, 377-79 (1990), contrast McKinney v. CTW Transport, 53 Mass.App.Ct. 741, 746 (2002) (language in the contract does not indicate that North Dakota law could cover tortious conduct or unfair acts inducing a breach of the contract). In Canal Elec. Co., the court held that a limitation of liability provision in a commercial contract which limited remedies to actual damages under the claim for breach of warranty could bar recovery for a claim under G.L.c. 93A, §11 arising from a breach of contact if it is “duplicative of a traditional contract claim.” Canal Elec. Co., 406 Mass. at 378-79; Mead Corp. v. Stevens Cabinets, 938 F.Sup. 87, 90 (D.Mass. 1996) (contractual limitation of liability clause barred G.L.c. 93A claim where the G.L.c. 93A count was no more than a “dressed-up breach of contract or breach or warranty claim”). The court reasoned that the legislature “did not intend in 93A to authorize cumulative damages ... for the same wrong,” and refused to allow the G.L.c. 93A claim which they viewed was an alternative theory of recovery under the contract. Id. at 379, quoting McGrath, v. Mishara, 386 Mass. 74, 85 (1982).
*287 Here, PIAM’s claim for violation of G.L.c. 93A is barred because it is nothing more than “an alternative theory of recovery on the contract” and PIAM has waived its right to recover. Canal Elec. Co., 406 Mass. at 379. Although PIAM claims that its G.L.c. 93A claim is a tort/contract mix, this is clearly not the case. PIAM withdrew its intentional and reckless misrepresentation claims prior to the trial. During the trial, PIAM only offered evidence concerning Investors Capital’s breach of the contract. Paragraph 23(c) of the Contract at issue contains a “Limitation of Damages” clause which states: “In no event, shall either party be liable to the other for any incidental, indirect, or consequential damages.” Also, there is nothing to suggest that, “in these circumstances, the waiver would frustrate the public policies of the statute” because it is merely a breach of contract. Id. at 379. Therefore, PIAM’s G.L.c. 93A claim is barred because it is nothing more than a dressed up breach of contract claim to which PIAM waived its right to recovery. Mead Corp., 938 F.Sup. at 90.
PIAM alleges that the limitation provision in the Contract does not bar recovery of its G.L.c. 93A claim because it is not seeking consequential damages. This reasoning, however, is misplaced because nothing in Canal Elec. Co. suggests that 93A claims are only barred if the party is seeking recovery of consequential damages. 406 Mass. at 377-79. Canal Elec. Co. answered two separate issues which were presented to the court: 1) if the limitation of liability provision in the sales contract was enforceable even if it failed its essential purpose; and 2) assuming that the limitation clause was enforceable, is such provision enforceable so as to bar remedies under G.L. 93A. Id. at 370. The court examined each question separately and answered both affirmatively. Id. There is nothing in the facts to suggest that the court’s conclusion would have differed if the plaintiff was not seeking consequential damages.

II. Unfair or Deceptive Acts

Even if this court is incorrect in holding that PIAM waived its right to recover under G.L.c. 93A, Investors Capital’s behavior did not rise to the level of unfair or deceptive acts as required to recover on a G.L.c. 93A claim. General Laws c. 93A, §§2 and 11 make unlawful “unfair or deceptive acts or practices in the conduct of any trade or commerce” between two businesses. Mass. Farm Bureau Fed'N v. Blue Cross of Mass., Inc., 403 Mass. 722, 729 (1989), citations omitted. An act or practice may be “unfair” within the statutory meaning without being deceptive or fraudulent. Id. To trigger liability under G.L. 93A, §11, the conduct in question “must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce”; Quaker State Oil Ref. Corp., v. Garrity Oil Co., 884 F.2d 1510, 1513 (1st Cir. 1989); have “an extraordinary quality that gives it the rancid flavor of unfairness”; Atkinson v. Rosenthal, 33 Mass.App.Ct. 219, 225-26 (1992); or falls “within ‘at least the penumbra of some common-law, statutory, or other established concept of unfairness . . . [or] is immoral, unethical, oppressive, or unscrupulous.’ ” Cambridge Plating Co. v. Napco, Inc., 85 F.3d 752, 769 (1st Cir. 1996), further citations omitted.
“Mere breaches of contract, without more, do not violate Chapter 93A.” Pepsi-Cola Metro. Bottling Co., 754 F.2d at 18. However, “conduct in disregard of known contractual arrangements and intended to secure benefits for the breaching party constitutes an unfair act or practice for c. 93A purposes.” Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d 47, 55 (1st Cir. 1998) (93A violation where breach of contract was to used to gain unfair advantage over the other, gives “the breach the rancid flavor of unfairness”) (citations omitted).
Nonpayment of obligations owed under the contract can also constitute a G.L.c. 93A violation. In Pepsi-Cola the court concluded that withholding monies owed is tantamount to commercial extortion, and in violation of G.L. 93A, when it is designed to force the non-breaching party to do what they otherwise could not be legally required to do. Pepsi-Cola 754 F.2d at 18 (affirmed finding of 93A violation where payment was withheld as a “wedge” to enhance bargaining power); Anthony’s Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 474 (1991) (93A violation where use of pretext was only used to coerce HBC into paying more then the contract required); Community Builders, Inc. v. Indian Motorcycle Assocs., Inc., 44 Mass.App.Ct. 537, 559 (1998) (“93A violation where defendant withheld payment for the purpose of stringing plaintiff along . . . with a purpose of coercing plaintiff to settle for substantially less compensation than the parties had agreed to before the service was performed”). However, where there is a good faith dispute over whether that payment is owed, and that dispute is clearly articulated, there is no Chapter 93A liability. Dooyang Corp., 147 F.3d at 56. See also, Pepsi-Cola 754 F.2d at 18 (withholding an owed amount does not constitute a violation of G.L. 93A when the amount is in dispute).
Here, Investors Capital clearly breached the contract, but the breach does not have “the rancid flavor of unfairness.” Dooyang, 147 F.3d at 55. Although Investors Capital did not pay PIAM after its initial November payment, this was not done to enhance its bargaining power or to string PIAM along for the purposes of coercing PIAM into settling for less money. Instead, this was done because there was a dispute to the amount owed under the contract. See Dooyang Corp., 147 F.3d at 56. Beginning in March 2003, Investors Capital sought a reduction in its payment obligation because the contract was not signed until October 2002; the database was not received until November 28,2002; and Investors Capital’s marketing efforts were put on hold until January 2003. Even *288 Auffermann told the board that PIAM wanted to accommodate Investors Capital’s request by bringing down the minimum guarantee by basing it on 2/3 of the year, since the contract had not been signed until October 2002, thereby changing the payment from $150,000 to $100,000. Although, Auffermann’s sentiment was short-lived, it does show that there was a legitimate payment dispute, and therefore, Investors Capitals’ withholding of the owed amount was not in violation of G.L.c. 93A. Dooyang Corp., 147 F.3d at 56.
Investors Capital’s conduct did not attain a level of rascality that would “raise an eyebrow of someone inured to the rough and tumble world of commerce.” Quaker State Oil Ref. Corp., 884 F.2d 1513. There is nothing to suggest that PIAM was committing more deeply to the program, that Investors Capital was receiving benefits under the contract without paying for them, or that Investors Capital was profiting at PIAM’s expense. Most of PIAM’s promotional efforts, including mailings, advertisements, brochures, and the golf clinic were made before January 2003. Although PIAM argues that Investors. Capital withheld its performance under the contract by allowing the number of sales agents in the program to dwindle from eleven to four, there is nothing to suggest that this had an impact on the program’s success. Obviously, there is no need to keep employees if there is no work to do. Also, although Investors Capital did not make monthly payments to PIAM, Investors Capital was still paying rent, salaries and marketing expenses in an effort to maintain the program. Investors Capital was not coercing PIAM into receiving benefits, especially those benefits which were received after Investors Capital terminated the contract. Further, there was no profit from which Investors Capital could benefit. The facts show that the year one revenue generated by the program did not exceed the minimum level of $150,000. When overhead and other costs are factored in, it is clear that Investors Capital was not benefitting from this program.
Investors Capital’s termination of the contract did not fall within “the penumbra of some common-law, statutory, or other established concept of unfairness . . . [or] is immoral, unethical, oppressive, or unscrupulous.” Cambridge Plating Co., 85 F.3d at 769. Investors Capital offered three main reasons why it was terminating the contract.[2] PIAM argues that these issues had been cured; however, it is obvious that significant damage had already been rendered and it was unlikely to be cured in the future. Also, Investors Capital tried to renegotiate the contract to compensate for these problems, PIAM even initially agreed that the renegotiation was needed. However, in the end, these negotiations never took place. Although, early termination of a business contract may not constitute a good business practice, it does not rise to the level of unethical, oppressive, or unscrupulous behavior giving rise to a G.L.c. 93A claim. Id.

ORDER FOR JUDGMENT

For the reasons stated above, it is hereby ORDERED that the Plaintiffs G.L.c. 93A, §11 claim against the defendant is DISMISSED.

 Around the time the letter was sent, Mastrototaro had left his position as program manager and Investors Capital did not replace him. Also, the financial agent staff has been reduced from eleven to four.

 Investors Capital alleged that PIAM had fraudulently induced it into entering the Contract by misrepresenting the number of Society members as being 24,000. Also, Investors Capital alleged that PIAM had not provided “acceptable” lists of members until February 2003. Further, PIAM failed to give timely approvals on marketing the financial service program to the point that Investors Capital could not begin soliciting Society members until January 2003.