Fremont-Smith, Thayer, J.
WorldCare, which was founded in part by Massachusetts General Hospital, assists pharmaceutical companies in obtaining approvals for their products. Bracco develops and manufactures imaging agents, called “contrasts,” that are used in Magnetic Resonance Imaging and Magnetic Resonance Angiography, to help radiologists better see pictures of arteries and organs inside the body. In 2001, Bracco hired WorldCare to perform consulting and advisory services in support of Bracco’s application for FDA approval for use of its product in the Renal, Carotid, Illiofemoral and Foot arteries.[1]
In 2004, Bracco terminated WorldCare in order to retain its competitor, Beacon. WorldCare then sued Bracco for alleged unpaid services and for alleged *699 unfair and deceptive trade practices. Bracco counterclaimed to recover what it contended were overpay-ments to plaintiff because of alleged deficiencies in plaintiffs provision of services.
The case was tried to a jury from May 8 through May 17, 2007, which returned a verdict against Bracco for $116,977 for unpaid services in regard to the first and second studies (studies which were the subject of express written contracts) and for $518,116 for unpaid services in regard to studies which the jury found were not subject to written contracts but which it was owed by Bracco for the value of plaintiffs services which Bracco had accepted, under a theory of quantum meruit. With respect to Bracco’s counterclaim, the jury found that WorldCare had materially breached the terms of the contracts as to the first two studies (which were the subject of express written contracts) to the extent of $161,643, but that Braceo had waived such breaches of contract.
The Court reserved for itself plaintiffs claims under c. 93A.

Findings and Rulings of the Court

Based on all of the credible evidence, the Court finds as follows.
WorldCare began working for Bracco on the first study (the Renal Study) in October 2001 based on an accepted proposal. Later, the parties signed a General Consulting and Services Agreement and Work Order which incorporated the proposal into signed documents.
WorldCare began working on the second study (the Carotid Study) in May 2002. As with the Renal Study, WorldCare began its work based on an accepted proposal. Later, the parties signed a General Consulting and Services Agreement and Work Order for that study.
WorldCare next began working on the third study (the Iliofemoral Study) in March 2003 and the fourth study (the Foot Study) in April 2003, based on accepted proposals. As the jury found, this work was never formalized by an express, written agreement. WorldCare’s President, Richard Taranto, whom I find to have been a creditable witness, testified that he had discussions with Bracco officials regarding executing a General Consulting and Services Agreement and Work Orders for the Iliofemoral and Foot Studies, just as the parties had done for the first two studies, and was told that Bracco was processing the paperwork. Bracco, however, never provided these documents to WorldCare for signature although it continued to accept plaintiffs services in regard thereto. Taranto further testified that because the parties did not sign written agreements for the last two studies, WorldCare did not invoice Bracco and Bracco never paid World-Care anything for plaintiffs services in regard thereto. Due to Bracco’s difficulty in finding doctors and patients to participate in the studies, the first and second studies took longer than expected so that the studies were not completed within the terms specified in the proposals and contracts (the “initial terms”). Braceo, however, instructed WorldCare to keep working and promised to pay WorldCare for its work during what the parties referred to as the contracts’ “extended terms.” Relying on Bracco’s assurances, WorldCare continued to provide the same services as it had during the contracts’ initial terms.
Taranto and WorldCare’s Project Manager, Christina Mastandrea, both testified credibly that they had discussions with Bracco personnel with a view to Bracco’s finalization of contracts for the extended terms of the first two studies as well as for the initial terms of the third and fourth studies.
Early in 2004, Bracco decided that it would investigate the replacement of WorldCare as the core lab on the four studies by Beacon, which was a competitor of WorldCare. Rather than inform WorldCare of this, however, it permitted WorldCare to continue to provide services in the expectation that it was to be paid therefore, even though Bracco secretly had decided otherwise.[2]
Not only had Bracco decided not to pay plaintiff anything more, but it plotted to secure a refund from WorldCare for payments which it had already made to it, by suggesting that Bracco change the payment terms, both retroactively and prospectively, for all of the studies, replacing the fixed monthly payment terms stipulated by the contracts and by the proposals, to a “milestone” payment methodology where payments would be based on the results achieved.[3] Although Bracco was already contemplating the replacement of WorldCare by Beacon, it led WorldCare to understand that this change would enable the parties to continue working together harmoniously and would result in execution of finalized contracts for the extended terms of the first two studies and for the last two contracts.[4] Bracco’s real intention was to effectuate a refund from WorldCare by procuring WorldCare’s agreement to the milestone method, and then to terminate it.[5]
Although, in May 2004, Bracco confirmed again internally its intention to end its relationship with WorldCare (“We’re not amending” the Renal and Carotid contracts with WorldCare), as has been previously noted, it indicated to WorldCare that it wished to restart contract negotiations, apparently to keep WorldCare working and to procure WorldCare’s agreement to agree to the new “milestone” pricing structure which would result in a refund from WorldCare rather than further payments from Bracco for WorldCare’s ongoing work.
On Friday, July 2, 2004, WorldCare produced, as requested, a detailed “reconciliation chart” to Bracco using the new “milestone” payment system, which resulted in steep discounts to Bracco even with respect to payments Bracco had already made. Taranto testi *700 fied that WorldCare made such a proposal as a good faith contract negotiation because, as noted above, it had been led to believe it would lead to finalized contracts for its continuing work on the studies.
As soon as it received WorldCare’s “reconciliation,” Bracco immediately contacted Beacon so as to replace WorldCare.[6] On July 27, 2004, Bracco informed Beacon “this program is ON.”
On July 29, 2004, however, unaware of these developments and still believing that Bracco was negotiating in good faith the provision of new contracts, WorldCare provided an updated “milestone” proposal to Bracco that even excluded the fees that it had already paid to Dr. Bourne, its London radiologist, whose work had been dilatory. Taranto testified that WorldCare anticipated that this proposal would finalize the agreements with Bracco for the initial terms of the third and fourth studies as well as the extended terms for all four studies. After receiving this proposal, however, Bracco decided that the time was now ripe to terminate WorldCare. But first, its employees set up a visit to WorldCare offices in Cambridge, Massachusetts to try to find some reason to justify the termination decision already made. Bracco told WorldCare only that it wanted to visit plaintiffs offices in Cambridge, Massachusetts.
Ms. Germann testified that she and Tara Rogers visited WorldCare in Cambridge in August 2004. Germann testified that she discovered deficiencies in WorldCare’s services during this visit, but Germann admitted that she neither told WorldCare about any claimed deficiencies nor gave WorldCare an opportunity to cure them.[7] Instead, Bracco continued to mislead WorldCare about its intentions. WorldCare participants described the meeting as cordial, followed by a pleasant dinner at Légal Seafood restaurant. Mastandrea testified that after the visit, Bracco told her that the visit was a success and “everything went great!” Mastandrea and Taranto also testified that the parties agreed there would be a conference call on September 2, 2004 to finalize the contracts for the initial and extended terms it had been promising WorldCare for months. During this conference call, however, Germann announced that Braceo was changing the agenda from the finalization of contracts to the termination of WorldCare due to a change in the FDA protocol on the studies.[8] It was only after World-Care demanded payment, prior to releasing its work product, that Braceo first claimed it was entitled to a refund and demanded WorldCare repay $51,558. This was premised upon its recalculation of payments under the “milestone” methodology and not upon any complaint about the quality of plaintiffs services.[9]

Conclusions of Law

Chapter 93A “was designed to encourage more equitable behavior in the marketplace . . . [and impose] liability on persons seeking to profit from unfair practices.” Linkage Corp. v. Trustees of Boston Univ., 425 Mass. 1, 25 (1997). Sections 2 and 11 of the statute prohibit those engaged in trade or commerce from employing “unfair methods of competition and unfair or deceptive acts or practices” in business transactions with others engaged in trade or commerce.
Defendant urges that the initial term of the first and second studies were governed by written contracts which specified a choice of law for New Jersey, which does not have an unfair and deceptive act statute. However, the extended term of the first and second studies, and the entire (initial and extended) terms of the third and fourth studies were not covered by any choice of law provision. The jury determined that $578,116 was owed by Braceo to WorldCare with respect to plaintiffs work not covered by any contract. Even with respect to the initial terms of the first two studies, defendant’s unfair practices described above extended far beyond the parameters of any legitimate contract dispute, so that the choice of law provision was inapplicable for purposes of c. 93A. See Stage-coach Transportation, Inc. v. Shuttle, Inc., 50 Mass.App.Ct. 812, 818 (2001).
Nor, as suggested by Braceo, did defendant’s activities occur primarily other than in Massachusetts. On the contrary, WorldCare’s offices are located in Cambridge, Massachusetts, and its contracts with Braceo were principally at, to, and from that location.
As noted above, Braceo kept its true intention to terminate WorldCare hidden while all the time inducing WorldCare to continue to provide services by repeated promises of continued payment and the provision of extended term contracts, when in fact it had no intention to pay plaintiff anything further or to enter into new or extended contracts, but only to demand a refund after inducing plaintiff to agree to a new method of computing past payments for WorldCare’s past provision of services.
Stringing someone along with false promises of payment to induce further performance, as Bracco did here, is a classic 93A violation. See The Community Builders, Inc. v. Indian Motorcycle Associates, Inc., 44 Mass.App.Ct. 537, 557-58 (1998) (defendants “withheld payment unconscionably, stringing [plaintiff] along . .. with a purpose of coercing [plaintiff] to settle for substantially less compensation than the parties had agreed to before the services were performed”); Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d 47, 55-56 (1st Cir. 1998) (expression of intent to pay money owed when having no intention to do so and a strategy of attempting to force more favorable price concessions by withholding payment gave rise to 93A liability).
In the Court’s view, Bracco’s conduct was knowingly and willfully unfair and deceptive, warranting multiple damages.
Should the damages be trebled or only doubled? Bracco’s actions described above were underhanded *701 and deceptive. The only thing that can be said by way of mitigation is that, because of Bracco’s inability to procure sufficient patients for the study sites, and the resultant delay in the provision of images to WorldC-are, WorldCare admittedly had by 2004 been paid a much higher percentage of the total contracted price for the first two studies than the percentage of services it had completed on those first two studies. While Bracco’s realization that it was getting the short end of the bargain did not justify its underhanded and deceptive efforts to get out of the agreements that it had made (WorldCare not having been responsible for most of the delay in achieving the contemplated results within the agreed time periods) the Court concludes that the egregious nature of Bracco’s conduct is somewhat mitigated by this circumstance, so that plaintiffs damages should be only doubled rather than tripled.
What amount should be doubled? The juiy found that plaintiff is entitled to $116,977 for unpaid work under the express written agreements for the first two studies, and an additional $578,116 for the quantum meruit value of unpaid work for the third and fourth studies not covered by contract and value of work done after the expiration date of the first two studies, or a total damage award of $695,093. While the juiy also found that WorldCare was overpaid $116,643 for material deficiencies in performance of the written contracts regarding the first two studies, it also specifically found that such breaches of contract by WorldCare, though material, were waived by Braceo.[10] It follows that there can be no recoveiy on the counterclaim or offset on the total juiy award.
ORDER.
Accordingly, the Court will award two times WorldCare’s total damages of $695,093, or $1,390,186, plus interest on the single damages[11] and reasonable attorney fees.
Defendant’s counterclaim is dismissed.
Plaintiff shall serve its motion for an award of attorney fees with supporting documentation on defendant within 21 days, and defendant shall file and serve the entire package consisting of plaintiffs papers and defendant’s opposition papers within an additional 21 days.
The parties shall provide the Court with their proposal computation of interest to be awarded, with any supporting legal authority.

Referred to herein as the “first,” “second,” “third” and “fourth” studies.

An internal e-mail dated February 6, 2004, set forth Bracco’s intention as follows:
No more payments will be made (since we have paid them a lot already) and they will still work on all 4 trials because of this. No more contracts will be signed right now . . .
See also internal Braceo e-mail dated March 18, 2004 stating that “in our quest to end our contract with WorldCare — I rated Beacon the other day to see capabilities to possibly handle the 4 MRA studies.”

This new payment methodology, which would alter the period monthly payments set forth in the contracts pursuant to which plaintiff had been receiving payment, resulted from a chart prepared by WorldCare in February 2004, which indicated it had been paid a much higher percentage of the total contract price on the first two studies (93% on the renal and 63.6% on the carotid study) than the percentage of work it had completed on each study (14% and 21% respectively). But the evidence established that the 14% and 21% represented the percentage of anticipated total images which plaintiff had actually had sent to it, so that plaintiffs scheduled work had to be delayed. “The General Consulting and Services Agreement” specified that it was Bracco’s responsibility to collect and send images from the many study sites around the country, to WorldCare, and that WorldCare was not to be held responsible for any delays caused by Bracco’s dilatory provision of the images.

See, for instance, Bracco’s e-mail dated May 26, 2004, wherein WorldCare was told it had been over-paid using the milestone method but that plaintiffs ongoing work will be paid and that negotiations for new contracts “needs to be started again.”

An internal e-mail admitted Bracco’s goal was to get a refund “before answering Bracco’s termination of WorldCare.”

Scott Rauscher of Braceo, who was also negotiating payment terms with WorldCare, told David LaPoint of Beacon “That if [Braceo got] the go ahead from the FDA, Beacon will be the core lab for Multihance,” and that Braceo “would be happy to provide a letter stating that, if requested.”
The Braceo team was similarly told:
We are in the middle of reviewing some costs from the other core lab and want to wrap this up next week. After that we can alert them that we are moving program.

The written contracts covering the first two studies provided for a 30-day notice of deficiency of services provision and a 30-day opportunity to cure such deficiency prior to any termination. Certain deficiencies had been noted earlier, but were promptly cured. When Bracco had complained that plaintiff had been sending images to its London radiologist in batches, rather than serially as soon as they were received, it promptly remedied this. When it was found that images were being processed without being “digitalized,” this defect was cured by WorldCare after only 32 hours of work. Dr. Bourne, WorldCare’s London radiologist, had admittedly been dilatoiy in performing his “quality control” on the images, but Braceo had been instrumental in the initial selection of plaintiffs radiologist, and had never instructed plaintiff to replace him, as plaintiff was willing to do.

Germann admitted that Bracco’s “overall strategy with legal was to keep this initial round somewhat friendly and focussed [sic] on transition and not ‘causal’ until a later stage when we have to defend why we want money back . . .”

Bracco’s first assertion that it was the provision of deficient services which caused the termination was made in defendant’s counterclaim.

There was ample evidence to support the jury’s finding of waiver. For instance, the written agreements provided that WorldCare be given 30 days notice of termination for deficient performance of services and a 30-day opportunity to cure. Here, Bracco continued to accept WorldCare’s services for months and then terminated it abruptly without providing it with any notice of deficiency or opportunity to cure.

See Makine U.S.A., Inc. v. Metlife Capital Credit Corp., 25 Mass.App.Ct. 302 (1988).